## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BCBSM, INC., d/b/a BLUE CROSS AND BLUE SHIELD OF MINNESOTA, *a Minnesota nonprofit corporation,* on behalf of itself and its self-insured groups, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GS LABS, LLC, *a Nebraska limited liability company,* | |
| Defendant. | |

BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota ("Blue Cross")
brings this Complaint against GS Labs, LLC ("GS Labs"), and alleges as follows.

### NATURE OF THE ACTION

1. This case concerns a COVID testing laboratory profiteering off the pandemic
and at Blue Cross's expense. COVID-19 is the deadliest disease to affect the United
States since the Great Influenza of 1918. Its virulence has fundamentally changed the
way most Americans live and work, and caused Congress to enact extraordinary
legislation to combat the pandemic. Determined not to let such a monumental public
health crisis go to waste, GS Labs pocketed millions of dollars in wasteful and
duplicative testing fees.

2. GS Labs is a Nebraska-based laboratory system that provides COVID-19
testing at sites in Iowa, Minnesota, Nebraska, Oregon, and Washington. Under the

Families First Coronavirus Response Act ("FFCRA"),[1] insurers must cover approved forms of COVID-19 testing at no cost to patients, as described below. In order to artificially increase the amounts it can bill insurers, GS Labs systematically subjects insured patients seeking COVID screening to expensive and wasteful testing (including testing for non-COVID diagnoses), and then bills their insurers, including Blue Cross, for that wasteful testing. In the words of one former employee, it "manipulates people into thinking they need all three Covid [sic] tests" that GS Labs offers, such that "[p]atients are being lied to just so th[e] company can make a profit."

3. GS Labs itself does not believe the additional tests it induces its patients to take will better detect COVID, as demonstrated by its frequent failure to maintain acceptable quality levels in its testing and reporting of results. In one incident, GS Labs failed to timely report the results of 200 tests, leading one individual who ultimately tested positive to "walk[ ] around with COVID for a week," potentially spreading the virus.[2] GS Labs has billed Blue Cross for hundreds of COVID-19 tests (if not more) that were, by its own admission, tainted by "deviat[ions] from applicable laboratory standards for testing facilities" that "may have impacted [patients'] test results."

---

[1] Pub. L. No. 116-127, 134 Stat. 178 (2020).
[2] Lauren Melendez, KCTV5, *"I walked around with COVID for a week, because of late results." GS Labs, subcontractor issue delays COVID info* (Dec. 19, 2020), https://tinyurl.com/45j9nwsv.

4. Despite these shortcomings, GS Labs has historically charged extraordinarily high prices, ranging from $380 to $979 per test.[3] These prices are in some cases *ten times* higher than those charged by other labs. But GS Labs maintains that insurers must pay these high prices, irrespective of its illegal testing practices and the quality of its work, due to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").

5. Congress passed the CARES Act[4] at the outset of the COVID-19 pandemic. The Act requires that, in the absence of an agreement to other rates, health insurers must reimburse laboratories for COVID-19 testing at the "cash price" they post to their websites.[5] Federal regulations implementing the CARES Act define "cash price" as "the charge that applies to an individual who pays in cash (or cash equivalent) for a COVID-19 diagnostic test."[6]

6. GS Labs posted extremely high prices for COVID-19 testing on its website, contending them to be its "cash prices" for purposes of the CARES Act. It has attempted to force insurers (including Blue Cross) to pay these exorbitant prices on that basis, threatening to sue them and to report them to federal authorities unless they pay in full.

7. But GS Labs' "cash prices" are a sham. For individuals *actually* paying cash, GS Labs has historically charged rates that are *one-third* of the rates posted to its website by making a "discount" of at least 70% available to every cash-pay patient. In addition to

---

[3] As discussed further below, after the filing of several lawsuits by insurers relating to GS Labs' prices and practices, GS Labs has very recently slashed its prices, including by more than 50% for its antigen test.

[4] Pub. L. No. 116-136, 134 Stat. 281 (2020).

[5] CARES Act § 3202(a); *see also* 42 U.S.C. § 256b *notes*.

[6] 45 CFR § 182.20.

slashing its testing prices, GS Labs has also recently reduced its discount to a limit of only 50%. In either case, it utilizes a "discount" specifically to obscure the fact that no cash customers are actually required to pay the "cash price" it is charging insurers like Blue Cross. GS Labs has thus misrepresented its "cash prices" in an effort to deceive Blue Cross into paying rates that far exceed the reasonable value of its services.

8. Finally, in order to ensure payment, GS Labs peppers its claims with falsehoods, despite language in the claim submission form by which GS Labs certified to Blue Cross that the information in the claims submission form is true. For example, nearly every claim GS Labs has submitted to Blue Cross has indicated that the patient complained of COVID-19 symptoms or exposure—symptoms GS Labs repeatedly submitted to Blue Cross despite not performing any in-person, individualized assessments of the patients. In some instances, the claims reflect unusual and extremely serious diagnoses. But GS Labs does not perform individual patient assessments, and includes these false diagnoses in an effort to obtain higher payments. In particular, doing so conceals the fact that, on information and belief, at least some of the testing performed by GS Labs is entirely excluded from the ambit of the CARES Act, such as screen testing for workplace safety.

9. Blue Cross paid GS Labs millions of dollars for COVID-19 testing both from plans it fully insures and from Administrative Services Only ("ASO") plans, some or all of which it has learned was not payable for the reasons discussed above. GS Labs has submitted other claims to Blue Cross for which it claims to be entitled to additional payment totaling millions more, which remain pending.

4

10. Blue Cross is entitled to recoup the amounts it paid for wasteful, unauthorized, duplicative, and faulty testing—both from fully insured plans and from ASO plans pursuant to the ASO contracts. Blue Cross further disputes that it owes the amount GS Labs claims. GS Labs is neither entitled to payment at the extraordinarily high rates it demands, nor for its wasteful, unauthorized, duplicative, or faulty testing.

11. In recent months, GS Labs has tacitly acknowledged its misconduct. In response to legal action by other insurers and national press scrutiny, GS Labs abruptly ceased offering the extra testing it had serially administered to patients without any plausible medical justification. It further slashed the prices of the two remaining tests it now offers dramatically, even as those prices remain significantly higher than the prices charged by other labs. But GS Labs' website makes clear that it *still* offers cash-pay patients different and lower rates than insured patients.

12. Blue Cross has attempted to negotiate with GS Labs, but GS Labs refuses to enter into a provider contract with Blue Cross that contains reasonable rates. GS Labs continues to submit claims to Blue Cross with extremely high billed charges and to demand payment in full from Blue Cross.

13. Blue Cross brings this action to recover the losses GS Labs has caused through its unlawful and deceptive actions, to dispel the cloud of legal uncertainty created by GS Labs' demands for excessive payment, and to enjoin GS Labs' continuing inequitable conduct.

## PARTIES

14. Blue Cross and Blue Shield of Minnesota is a nonprofit corporation incorporated in Minnesota, with its principal place of business in Dakota County, Minnesota. Blue Cross offers fully insured health plans and serves as an administrator for self-funded insurance plans.

15. Defendant GS Labs, LLC is a limited liability company formed under the laws of Nebraska, with its principal place of business in Nebraska. GS Labs has represented in filings with this Court that its sole member is a resident of Nebraska.[7]

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Blue Cross and GS Labs and the amount in controversy exceeds $75,000.

17. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, Blue Cross asserts a claim under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* Blue Cross has standing to bring its ERISA claims as a claims fiduciary on behalf of its own employee benefit plan and for the self-funded health plans it administers.

---

[7] Compl. ¶ 7, *GS Labs, LLC v. Medica Insurance Company*, Case No. 0:21-cv-02400 (D. Minn. Oct. 28, 2021).

18. The Court has subject matter jurisdiction over Blue Cross's state and common law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

19. This Court has personal jurisdiction over GS Labs because this case arises out of activities GS Labs conducted in, and directed toward, Minnesota. In particular, it arises out of COVID-19 testing GS Labs performed on Minnesota residents at testing sites it maintains in Minnesota, and out of insurance claims GS Labs submitted to Blue Cross in Minnesota related to that testing.

20. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action have occurred in this district. Specifically, GS Labs maintains its Minnesota testing sites in this district.

## BACKGROUND

### Blue Cross's Fully Funded and Self-Funded Health Plans

21. Blue Cross is a nonprofit health service plan corporation serving Minnesota.

22. As relevant to this litigation, Blue Cross offers both fully funded health plans, and provides administrative services for self-funded health plans.

23. Blue Cross both funds and administers its fully funded plans. Blue Cross pays claims submitted to its fully funded plans out of its own assets.

24. Blue Cross's self-funded plans, or Administrative Services Only ("ASO") plans, are funded by contributions from their respective sponsor employers and member employees. Most of Blue Cross's ASO plans, including plans at issue in this litigation, are subject to ERISA.

7

25. Blue Cross provides administrative services for ASO plans pursuant to Administrative Services Agreements, which identify the respective rights and obligations of Blue Cross and the plan sponsors. Blue Cross serves as a fiduciary of its ASO plans that are subject to ERISA.

26. Blue Cross acts as claims administrator and has been delegated the authority to pursue recovery of payments made by Blue Cross on behalf of certain self-funded plans covered by ERISA. Blue Cross has standing to sue under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for declaratory and injunctive relief to enjoin any acts or practices that violate the provisions of the plans and to obtain other appropriate relief to redress violations of and enforce plan terms.

27. Blue Cross will provide further details concerning the health plans and claims at issue in this litigation following the entry of a HIPAA qualified protective order.

28. Beyond health plans Blue Cross insures or administers, Blue Cross serves members of other Blue Cross Blue Shield companies through the BlueCard program. Through the BlueCard program, Blue Cross processes and pays claims for members of other Blue Cross Blue Shield companies in the first instance.

### The CARES Act and Applicable Regulations and Guidance

29. In response to the COVID-19 pandemic, Congress passed the FFCRA on March 18, 2020.

30. The FFCRA requires, in relevant part, that health insurers cover approved forms of COVID-19 testing and services attendant to that testing with no patient cost-sharing obligations.[8]

31. It further provides, in a subsection titled "ENFORCEMENT," that "the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury" are charged with enforcing this provision of the Act.[9]

32. On March 27, 2020, Congress supplemented the FFCRA with the CARES Act, which (among other things) governs reimbursement for COVID-19 testing. The CARES Act states, in relevant part:

> (a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:
> . . .
> (2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.[10]

---

[8] FFCRA § 6001(a); *FAQs about Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 43* (June 23, 2020), https://tinyurl.com/yc57v9vn.

[9] FFCRA § 6001(b).

[10] CARES Act § 3202(a).

33. The CARES Act requires "each provider of a diagnostic test for COVID–19 [to] make public the cash price for such test on a public internet website of such provider," and subjects providers who fail to do so to monetary penalties.[11]

34. Providers must post their "cash price" in a centralized, easy-to-find location, and must include "[a]ny additional information as may be necessary for the public to have certainty of the cash price that applies to each COVID-19 diagnostic test."[12] As explained by the Centers for Medicare & Medicaid Services ("CMS"), "if the provider offers the same test at a different cash price that is dependent on location or some other factor, then on its website listing of cash prices, the provider must indicate all the cash prices that apply to the test and relevant distinguishing information as to when each different cash price applies."[13] Similarly, COVID-19 test pricing must be available "[w]ithout having to submit personal identifiable information."[14]

35. Federal regulations issued by CMS implementing the CARES Act define "cash price" to mean "the charge that applies to an individual who pays cash (or cash equivalent) for a COVID-19 diagnostic test."[15]

36. CMS explained this definition in its interim final rule as follows:

The "cash price" is generally analogous to the "discounted cash price" as defined at 45 CFR 180.20 for purposes of the Hospital Price Transparency final rule. As we explained in that rule, providers often offer discounts off their gross charges or make other concessions to individuals who pay for their own care (referred to as self-pay individuals). . . . We also stated that

---

[11] *Id.* at § 3202(b).
[12] 85 FR at 71204.
[13] *Id.* at 71153.
[14] *Id.* at 71204.
[15] 45 CFR § 182.20.

the discounted cash price may be generally analogous to the "walk-in" rate that would apply to all self-pay individuals, regardless of insurance status, who pay in cash at the time of the service, and that such charges are often lower than the rate the hospital negotiates with third party payers because billing self-pay individuals would not require many of the administrative functions that exist for hospitals to seek payment from third party payers (for example, prior authorization and billing functions). It is therefore our expectation that the "cash price" established by the provider will be generally similar to, or lower than, rates negotiated with in-network plans and insurers.[16]

37. If a provider fails to post its "cash price" in a manner consistent with the CARES Act and its implementing regulations, it is not entitled to payment at any particular rate under the CARES Act. As CMS has explained, "[t]he requirement imposed by section 3202(a) of the CARES Act to reimburse the provider an amount that equals the cash price of a COVID-19 test is contingent upon the provider making public the cash price for the test, as required by section 3202(b) of the CARES Act."[17] Because "section 3202(a) is silent with respect to the amount to be reimbursed for COVID-19 testing in circumstances where the provider has not made public the cash price for a test and the plan or issuer and the provider cannot agree upon a rate that the provider will accept as payment in full for the test," any right the provider may have to payment in such cases "is governed by applicable state law."[18]

---

[16] 85 FR at 71152.

[17] *See* CMS, *FAQs about Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 43* (June 23, 2020), https://tinyurl.com/yc57v9vn.

[18] *Id.*

38. CMS has clarified that certain kinds of testing for COVID-19 are not subject to the CARES Act's coverage requirement, and therefore also the "cash price" provisions. In particular, the CARES Act coverage provision does not apply to "testing for general workplace health and safety, for public health surveillance, or for other purposes not primarily intended for individualized diagnosis or treatment of COVID-19."[19]

39. CMS has raised concerns that the "cash price" requirement may lead to "price gouging," and has requested comment on "authorities and safeguards that could be used to mitigate concerns for price gouging both for group health plans and issuers and for consumers receiving a COVID-19 diagnostic test."[20] It has explained that while "most providers have been pricing COVID-19 tests at reasonable levels, generally consistent with reimbursement rates set by the Medicare program, . . . some providers have not done so and are using the public health emergency as an opportunity to impose extraordinarily high charges."[21]

### GS Labs and its Unlawful Testing Practices

40. GS Labs is a laboratory system founded in January of 2020. It operates COVID-19 testing sites throughout the United States. Four of those sites are located in Minnesota: one in Blaine, one in St. Paul, one in Shakopee, and one in Eagan. GS Labs is

---

[19] CMS, *FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 44* (Feb. 26, 2021), https://tinyurl.com/n74pbah5.
[20] 85 FR at 71153.
[21] CMS, *FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 44* (Feb. 26, 2021), https://tinyurl.com/n74pbah5.

also in the process of opening additional Minnesota sites: one in Stillwater and one in Rochester.

41. There are many other testing sites near each of GS Labs' Minnesota locations offering the same or similar testing services: six within ten miles of the Blaine site, ten within ten miles of the St. Paul site, three within ten miles of the Shakopee site, six within ten miles of the Eagan site, one within ten miles of the forthcoming Stillwater site, and four within ten miles of the forthcoming Rochester site. These other providers offer COVID-19 testing at a fraction of the price charged by GS Labs, and without the endemic quality problems that have plagued GS Labs, discussed below.

42. GS Labs' testing sites serve high volumes of patients with short appointments. It has represented that each testing site can accommodate upwards of 1,000 patients a day.

43. Typically, patients remain in their cars throughout the appointment, and nurses obtain samples for testing through the car window. Below is a photo of a representative GS Labs testing site, located in Lee's Summit, MO:



44. GS Labs currently offers two types of COVID-19 tests:

    a. **Rapid Antigen testing:** These tests require a nasal swab of the patient. They detect protein fragments indicating COVID-19 infection, and produce results quickly—typically in as little as 20 minutes. These tests are relatively cheap and are highly effective in detecting most COVID-19 infections.

    b. **COVID-19 Polymerase Chain Reaction ("PCR") testing:** These tests require a nasal or oral swab of the patient. They detect genetic material indicating COVID-19 infection, and most labs are able to produce results for COVID-19 PCR tests within 24 hours. While these tests are slower and somewhat more expensive than rapid antigen tests, they are also slightly more effective at detecting COVID-19 exposure early on.

45. Prior to January 9, 2022, GS Labs also offered several additional forms of testing:

    a. **Rapid Antibody Testing:** These tests require a blood sample from the patient. Unlike the tests discussed above, rapid antibody testing does not detect current COVID-19 infection. Rather, it detects antibodies that develop after COVID-19 exposure, which can indicate prior COVID-19 infection.

    b. **Large-Panel PCR Testing:**

        i. *Bio-Fire PCR testing*: These tests are like COVID-19 PCR tests, but detect 21 respiratory pathogens in addition to COVID-19. They are significantly more expensive than COVID-19 PCR tests and provide no additional benefits related to detecting COVID-19 infection.

        ii. *GenMark ePlex Respiratory Pathogen 2 Panel testing*: These tests are also like COVID-19 PCR tests, but detect 20 respiratory pathogens in addition to COVID-19. They too are significantly more expensive than COVID-19 PCR tests and provide no additional benefits related to detecting COVID-19 infection.

46. Following legal action by other insurers, GS Labs no longer offers antibody or large-panel testing.

47. The appropriate test to administer among those listed above depends on the patient's needs and circumstances. Rapid antibody testing serves a diagnostic purpose only in very limited circumstances. The CDC has explained that antibody testing

generally "should not be used to establish the presence or absence" of a COVID-19 infection. Similarly, "it is not currently known whether a positive antibody test result indicates immunity against SARS-CoV-2; therefore, at this time, antibody tests should not be used to determine if an individual is immune against reinfection." Instead, antibody testing only serves a diagnostic purpose when: (1) administered more than a week after the onset of acute illness in patients who had a previous negative antibody test but did not receive a positive viral test; or (2) when patients present with late complications of COVID-19 illness.[22] The CARES Act only applies to antibody testing in these limited circumstances. And Blue Cross's policies only cover antibody testing when ordered or administered by an attending healthcare provider "as the FDA advises that antibody testing should not be used for diagnosis of COVID-19."[23]

48. Typically, a PCR test is required to confirm the results of an antigen test.

49. There are virtually no circumstances under which it is appropriate to perform an antibody test in conjunction with an antigen test—and certainly not both an antigen test *and* a PCR test.

50. Similarly, large-panel tests are appropriate only in very limited circumstances, and are generally not appropriate to administer to asymptomatic individuals.

51. Despite the foregoing, GS Labs has historically attempted to administer each type of test to each patient whenever possible—so long as that patient had commercial

---

[22] CDC, *Interim Guidelines for COVID-19 Antibody Testing* (updated Jan. 24, 2022), https://tinyurl.com/3vx4wwfa.
[23] BCBSMN, COVID-19 Resource Center, https://tinyurl.com/47hjm2bf.

insurance. GS Labs administered these inappropriate and wasteful tests solely to increase the amount it was able to bill to insurers.

52. GS Labs accepts only commercial insurance or cash payment. It does not accept Medicare, which covers much of the elderly population most vulnerable to COVID-19, or Medicaid, which covers financially distressed individuals who may have difficulty paying for COVID-19 testing out-of-pocket.

53. GS Labs' treatment of insured patients contrasts markedly with its treatment of uninsured patients paying in cash.

54. In order to book an appointment, GS Labs historically required insured patients to consent to receive each test. Prior to its testing service change on January 9, 2022, GS Labs required patients to consent to receive a "Rapid Antibody test," "Rapid Antigen test," *and* a "COVID-19 PCR and respiratory panel test." It required patients to agree to receive all three tests regardless of why the patient sought COVID-19 testing. Insured patients could not select a specific test.

55. Because GS Labs buried the testing consent within a "clickwrap" agreement, patients often were not aware that they had agreed to that unusual term. For example, in a complaint to the Washington State Attorney General's Office, one consumer stated:

> I thought I had Covid and went to GS Labs in Federal Way on Sunday after finding them online for a rapid Covid test. They were the only ones open Sunday. Upon arrival I was never asked if I wanted an antibody test, or a PCR test, yet after my visit was complete I got emails that they were running those tests. I am contesting having to pay for those. It was not made clear to me I would get those or be charged for those.

56. In contrast, GS Labs has historically required cash-pay patients to select a specific test to book an appointment, and those patients received *only* the test they specifically booked. That serves as a tacit acknowledgement by GS Labs that performing multiple tests on insured patients is unnecessary and abusive.

57. GS Labs' policies required nurses to at least attempt to administer all three tests to every insured patient. According to filings by other insurers in litigation with GS Labs, nurses were generally expected to administer all three tests to every patient, and had to explain tests that were "missing" (*i.e.*, not performed on a given patient). GS Labs tracked the number of tests performed by each of its nurses, praising those who succeeded in administering multiple tests to patients while punishing those who did not—including by terminating their employment.

58. As a result, GS Labs' nurses aggressively pushed multiple tests on patients, and regularly provided false and misleading information about the tests. For example, filings by other insurers in litigation with GS Labs disclose that GS Labs' nurses falsely told patients that rapid antibody testing could detect active COVID-19 infection, that it could determine whether a patient has developed immunity to COVID-19, and that insurance covered antibody testing in every instance. Nurses also told patients (falsely) that it is standard medical practice to administer all three types of tests together.

59. These instances are corroborated by public statements by other ex-employees, such as the following:

> [GS Labs] manipulates people into thinking they need all three Covid tests (antibody, antigen, and PCR). The nurses were told to go to the cars and immediately start doing the antibody test (finger stick) to distract the patient.

Nurses were being let go if they didn't persuade enough people to get all three tests. Management would follow the nurses to make sure they were getting patients to do all three tests (even if they weren't needed). Patients are being lied to just so this company can make a profit.

60. Another former employee lodged the following complaint with a state regulator:

Starting the week of 1/11/21 we were told we needed to get every person to take the antibody test as insurance will pay for both. I inquired about what the "runners"/check-in people were saying after being yelled at by multiple cars for confirming they were having both tests done when they did not want that. . . . On 1/18/21 the lead RN, Paula Berg, shadowed me after telling me my numbers were the lowest. She told me the other new lead RN informs people the antibody test confirms the antigen test . . . . She observed me sell and educate patients on the extra test and the following day fired me for not selling enough tests. She claims this came from HQ in Omaha. . . . I hope you can work to revoke the business licenses for their locations upon finding the negligence and fraudulent insurance billing/unethical practices of telling patients the antibody test has actual clinical value for diagnostics (and even if they are contagious- which is erroneous as IgM antibodies can last a month after exposure) or not even tell patients why they are getting the test done.

61. In order not to receive all three tests, patients historically had to affirmatively refuse to undergo the additional, unnecessary testing at the testing location, in the face of urging by GS Labs' nurses.

62. Similarly, prior to January 9, 2022, GS Labs regularly performed and billed insurers for expensive and unnecessary Bio-Fire and GenMark respiratory panel tests, which detect numerous pathogens unrelated to COVID-19, when not justifiable. Indeed, GS Labs has represented to Blue Cross that, for much of the relevant period, *all* of its PCR testing was performed using large-panel testing equipment. There is no medical

reason to regularly perform large panel tests on patients who seek only COVID-19 testing. Indeed, the federal government has prosecuted this practice as health care fraud.[24]

63. In keeping with GS Labs' requirement that all insured patients consent to wasteful tests, when patients who consented to additional tests when making an appointment balked upon arriving, GS Labs' nurses were trained to urge each patient to submit to multiple tests. In fact, according to filings by other insurers, GS Labs affirmatively instructed its nurses not to ask questions of patients. At no point did any medical professional associated with GS Labs evaluate the medical needs of a patient before recommending or performing tests.

64. Instead, GS Labs relied solely on intake paperwork for insured patients that requires patients to check a box stating, "I acknowledge that I am seeking a diagnostic test." This box appeared near a disclaimer that read: "GS Labs only accepts insurance patients who are seeking testing for diagnostic purposes. Patients must be experiencing Covid-19 symptoms or have had a potential exposure to Covid-19 to qualify for a wasteful diagnostic test."

65. GS Labs treated this deliberately vague and confusing certification as an affirmation that *every* insured patient has had possible COVID-19 exposure or symptoms—without any in-person, individualized assessment of the patient. Given the high volumes of insured patients GS Labs serves, GS Labs knows that this is not the case.

---

[24] *See* Indictment, *United States v. Malena Badon Lepetich*, Case No. 3:21-cr-00032 (M.D. La. May 20, 2021).

66. Indeed, despite this certification, GS Labs still accepted patients who indicated elsewhere in their intake paperwork that they had not had potential COVID-19 exposure or experienced COVID-19 symptoms—meaning that the patient would be covered only under standard plan terms, rather than pursuant to the CARES Act. Even when insured patients had specifically informed GS Labs nurses that they had neither potential COVID-19 exposure nor symptoms, GS Labs' nurses not only proceeded with testing, but also continued to urge patients to undergo multiple tests.

67. Moreover, on information and belief, GS Labs performed a significant amount of screen testing for workplace safety. GS Labs personnel were aware that the patients at issue sought testing for that purpose. Such screen testing is not diagnostic in nature, not subject to the CARES Act, and not covered by Blue Cross's policies.[25] Blue Cross does not reimburse providers for wasteful and inappropriate testing, or COVID-19 testing performed for non-diagnostic purposes, such as that discussed above.

68. For much of the period at issue in this litigation, GS Labs performed all of its testing nationwide under the auspices of standing orders issued by Steve W. Powell, M.D., a psychiatrist based in Franklyn, NH. Dr. Powell plays no role in assessing patients or directing their treatment.

69. These standing orders authorize GS Labs to perform each of the various tests it offers only when patients meet certain criteria. Among other things, the standing orders

---

[25] CMS, *FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 43* (June 23, 2020), https://tinyurl.com/yc57v9vn.

require that, for each test, patients meet minimum criteria related to COVID-19 exposure or symptoms. They authorized large-panel tests like the Bio-Fire and GenMark respiratory panel tests only for patients who fall into a "High Risk Group." GS Labs, however, inappropriately classifies all patients over 65 as "high risk," and so inappropriately pushes wasteful large-panel tests on those patients based on age alone.

70. Even if GS Labs has restricted the large-panel testing to its announced definition of High Risk Group, which it did not, the testing would in many cases have nonetheless been wasteful, because GS Labs defined the High Risk Group to include anyone over 65, a definition which does not match federal guidance for large panel testing.

71. The standing orders further included specific procedures that GS Labs was required to follow for testing. They required GS Labs' nurses to verify that patients met the criteria for testing, and obtain verbal agreement (in addition to written consent) for each test administered.

72. On information and belief, GS Labs did not inform its nurses of the contents of these standing orders or train its nurses to follow them. GS Labs and its nurses do not adhere to the criteria or procedures set out in the standing orders, and instead administer as many tests as possible to every insured patient.

73. Blue Cross does not reimburse providers for abusive testing, such as that discussed above.

74. Beginning in November 2021, GS Labs updated its medical necessity policy to cease requiring insured patients to undergo wasteful large-panel and antibody testing, and

now no longer offers either test. GS Labs also acknowledged that antibody testing "may be declined by insurers." This serves as a tacit acknowledgment that its prior practices were unlawful and inequitable.

### Endemic Quality Problems with GS Labs' Testing

75. GS Labs has repeatedly failed to control the quality of its testing and reporting of results. Public records disclose instances in which GS Labs has misreported results, failed to timely report results, and failed to report results altogether. GS Labs' error rate is also significantly higher than other labs that perform the same tests for a fraction of the price.

76. In March of 2021, the Nebraska Department of Health and Human Services informed GS Labs that its facilities failed to meet the standards necessary to perform clinical testing under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), and ordered GS Labs to take remedial measures.

77. As particularly relevant here, GS Labs sent correspondence to some of its patients notifying them that GS Labs had identified a lapse in its "quality control process" for certain of its PCR testing lasting from "3/17/21 [to] 4/9/21." This caused it to "deviate[ ] from applicable laboratory standards for testing facilities" during that period of several weeks. GS Labs stated that this lapse in quality control "may have impacted [patients'] test results."

78. GS Labs did not inform Blue Cross of this lapse, despite having submitted claims for potentially faulty and inaccurate PCR testing to Blue Cross during that time period, totaling nearly $740,000.

79. Similarly, a letter from GS Labs' Medical Director publicly disclosed in litigation between GS Labs and another insurer states "[t]esting performed at GS Labs between 7/1/2020 and 10/31/2020 may be inaccurate due to incomplete equipment validation studies and quality control records."

80. In another case, GS Labs failed to timely report the results of nearly 200 COVID-19 tests. This led at least one individual who ultimately tested positive to "walk[ ] around with COVID for a week," potentially spreading the virus.[26]

81. Blue Cross does not reimburse providers for testing that fails to meet applicable standards for quality and reliability.

**GS Labs' False "Cash Prices" for COVID-19 Testing**

82. Despite the above problems with its testing procedures and quality, GS Labs has historically charged insurers exorbitant rates for COVID-19 testing, ranging from $380 to $979.

83. These prices were significantly out of step with those CMS has deemed "reasonable"—*i.e.*, prices "generally consistent with reimbursement rates set by the Medicare program."[27] As demonstrated by the following chart, the prices GS Labs charged insurers for COVID-19 testing well exceed the reimbursement rates set by Medicare Administrative Contractors, and in some cases are *seven to eight times*

---

[26] Lauren Melendez, KCTV5, *"I walked around with COVID for a week, because of late results." GS Labs, subcontractor issue delays COVID info* (Dec. 19, 2020), https://tinyurl.com/45j9nwsv.

[27] CMS, *FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 44* (Feb. 26, 2021), https://tinyurl.com/n74pbah5.

Medicare rates.

| Test | GS Labs' Posted Rate | Medicare Rate |
|------|----------------------|---------------|
| Rapid Antibody | $380 | $45.23 |
| Rapid Antigen | $380 | $41.38 |
| COVID-19 PCR | $385 | $51.31 |
| GenMark / BIO-Fire PCR / RPP | $979 | $416.78 |

84. On January 9, 2022, in the wake of litigation and national press scrutiny, GS Labs announced that it had reduced its prices dramatically. But even its reduced prices are much higher than Medicare rates:

| Test | GS Labs' Posted Rate | Medicare Rate |
|------|----------------------|---------------|
| Rapid Antigen | $179 | $41.38 |
| COVID-19 PCR | $229 | $51.31 |

85. These prices are far higher than those charged by other labs, and bear little relationship to the cost of performing such tests (which can cost a lab as little as $20 for

antigen testing). Accordingly, GS Labs' rates have led to at least one investigation for price gouging by the Kansas Department of Insurance.[28]

86. Under normal circumstances, GS Labs would have no expectation that any insurer would pay its extraordinarily high prices. But GS Labs contends that the COVID-19 pandemic, and the CARES Act, give it a right to force insurers to pay whatever it asks.

87. GS Labs has attempted to deceive Blue Cross by obscuring its true cash price and demanding payment at rates two to three times as great. GS Labs posted the above prices to its website, contending them to be its "cash prices" for purposes of the CARES Act. On that basis, GS Labs has demanded that insurers—including Blue Cross—pay these prices in full.

88. But the prices posted to GS Labs' website are not its "cash prices" as that term is defined under the CARES Act. As discussed above, "cash price" under the CARES Act means "the charge that applies to an individual who pays cash (or cash equivalent) for a COVID-19 diagnostic test."[29] It is "generally analogous to the 'discounted cash price' . . . for purposes of the Hospital Price Transparency final rule," which accounts for "discounts" providers offer "off their gross charges or . . . other concessions to individuals who pay for their own care."[30]

---

[28] Kyle Palmer, Shawnee Mission Post, Lenexa lab flagged for potential price gouging of COVID-19 tests — what consumers need to know (Dec. 21, 2020), https://tinyurl.com/2ea4vx3y.
[29] 85 FR at 71204.
[30] *Id.* at 71152.

89. For individuals paying out-of-pocket, GS Labs charges much lower rates. Historically, GS Labs charged less than a third of what it claimed to be its "cash prices," by making a 70% "discount" off its purported "cash prices" available to *every* cash-pay patient. Even after January 9, 2022, GS Labs still offers cash-pay patients a 50% "discount" of the supposed "cash price" it charges Blue Cross.

90. When booking a testing appointment through GS Labs' website, there are two options: "Bill My Insurance" and "Out-of-Pocket."[31] Until recently, the "Out-of-Pocket" option directed patients to "Complete the form below to qualify for up to a 70% [now 50%] discount on the Out-Of-Pocket costs." The following is an example of that form:



[31] *E.g.*, https://gslabstesting.com/covid-rapid-testing-bloomington/.

91. As reflected above, the form includes radio buttons allowing the user to select "I do not currently have insurance," "I do not currently have insurance with out-of-network benefits," "I am not currently covered by Medicaid or a Medicaid HMO Plan," and "My monthly income is below $2,000/mo. per dependent."

92. These options are such that anybody may truthfully select one. A patient who is uninsured can truthfully select "I do not currently have insurance." A patient who is privately insured or insured by Medicare can truthfully select "I am not currently covered by Medicaid or a Medicaid HMO Plan." And finally, a patient who qualifies to be insured by Medicaid can truthfully select "My monthly income is below $2,000/mo. per dependent." Thus, any patient can qualify in at least one category.

93. If the user selected any option except "none of the above," and without providing any additional information or verification, he or she received the following message:



94. Inputting that code while entering payment information reduced the price of testing to less than one-third of GS Labs' posted "cash price," as demonstrated below.



95. Any self-pay patient could therefore easily access the discounted rate, and is strongly encouraged to do so by GS Labs.[32] By offering such an easily accessible discount rate, GS Labs is able to claim a $900 "cash price" for insurance reimbursement purposes without losing *actual* cash customers who competitors whose posted cash rates are far lower than GS Labs'.

96. Recently, GS Labs has changed the form above to instead require cash-pay patients to answer a series of questions regarding their income. On information and belief, inputting *any* income level results in the patient receiving a code for a 50% "discount" off GS Labs' cash prices. Cash-pay patients therefore continue to pay less than insurers.

---

[32] Notably, even these fractional cash prices were *still* significantly higher than what other labs charge and what CMS has deemed reasonable rates.

97. This is consistent with representations GS Labs made to Blue Cross that it charges cash-pay patients a reduced rate, as well as representations GS Labs has made in filings in other litigation that cash-pay patients are eligible for discounts off of GS Labs' "cash prices."

98. Indeed, in response to a consumer complaint of price gouging, GS Labs has represented to the Washington State Attorney General's Office that "the 'cash prices' listed on GS Labs' website generally are charged only to insurance companies, and *not* consumers," and that GS Labs' purported "'cash prices' apply to insurance companies only." GS Labs further stated unequivocally: "GS Labs has *never* charged a consumer for the 'cash price' of a COVID-19 test, even if they have no health insurance." But any definition of "cash price" that ignores the prices charged to cash customers is inconsistent with 45 CFR § 182.20, the federal regulation implementing the cash price provision of the CARES Act.

99. Because GS Labs charged all or virtually all cash-pay patients less than one-third of its claimed "cash price," GS Labs has failed to post its "cash price," as that term is defined under the CARES Act. It has instead posted prices that are significantly higher, without disclosing its true "cash prices" on its website in a manner consistent with federal law.

100. In addition to the above, federal regulations implementing the CARES Act make clear that in posting its "cash price," GS Labs must include "[a]ny additional information as may be necessary for the public to have certainty of the cash price that

applies to each COVID-19 diagnostic test."[33] As explained by CMS, "if the provider offers the same test at a different cash price that is dependent on location or some other factor, then on its website listing of cash prices, the provider must indicate all the cash prices that apply to the test and relevant distinguishing information as to when each different cash price applies."[34]

101. GS Labs' "COVID-19 Pricing Transparency" webpage omits any reference to the fact the posted test prices are significantly higher than the rates charged to cash-pay patients.[35] This independently violates GS Labs' obligations under the CARES Act.

102. Finally, COVID-19 test pricing must be available "[w]ithout having to submit personal identifiable information,"[36] yet GS Labs requires patients to fill out a form with their personal information before confirming (invariably) that the patient qualifies for a discount. This too violates the CARES Act.

103. Because GS Labs stands in violation of the CARES Act's requirement that it "make public [its] cash price," and has not posted its cash price on its website consistent with federal law, it has no established "cash price . . . listed . . . on a public internet website" for purposes of the CARES Act.

104. Despite its knowing disregard of the letter and spirit of the CARES Act, GS Labs has nevertheless attempted to use the CARES Act as a cudgel to threaten and intimidate insurers.

---

[33] 85 FR at 71204.
[34] *Id.* at 71153.
[35] *See* https://gslabstesting.com/covid-19-pricing-transparency/.
[36] 85 FR at 71204.

**GS Labs' Submission of Claims to Blue Cross and Demands for Payment**

105. GS Labs has submitted more than 190,000 claims to Blue Cross for COVID-19 testing.

106. Many (indeed, most) of the claims submitted prior to late 2021 reflect multiple tests in wasteful and inappropriate combinations—a result of GS Labs' policy of pressuring patients to submit to unnecessary testing.

107. Numerous other claims submitted prior to late 2021 reflect antibody testing standing alone. Given GS Labs' testing practices and the very narrow circumstances under which antibody testing serves a recognized diagnostic purpose, it is virtually impossible that all (or even a substantial portion) of these tests are covered under Blue Cross's policies.

108. Many thousands of the claims pertain to expensive large-panel tests, which (to a virtual certainty) were not justified.

109. At least 975 claims pertain to testing that was, by GS Labs' own admission, tainted by GS Labs' "deviat[ion] from applicable laboratory standards for testing facilities" that "may have impacted [patients'] test results."

110. In addition to the above, most claims include information that appears virtually certain to be false or incorrect.

111. Nearly all of the claims (99.4%) include diagnosis (ICD) codes indicating that the patient had exposure to COVID-19. This is statistically improbable in the extreme.

112. Many claims include other extraordinarily unlikely diagnosis codes used to support expensive testing. For example, some claims list an ICD code indicating a diagnosis of acute respiratory distress syndrome—a serious (and often deadly) condition in which fluid builds up in the alveoli of the lungs. On information and belief, GS Labs' facilities lack the equipment necessary to diagnose this condition.

113. All or virtually all of the claims include errors with respect to the listed National Provider Identifier (NPI), CLIA number, and/or Place of Service CPT code, obscuring the location and licensure of the laboratory that actually performed the testing.

114. GS Labs largely refused to comply with the pre-payment review process, but did ultimately agree to provide a small sample of medical records for some claims. To the limited extent GS Labs has provided medical records as part of the pre-payment review process, these have confirmed Blue Cross's suspicions and raised additional concerns.

115. The medical records Blue Cross received also demonstrated further deficiencies with respect to the claims, many of which render the claims unpayable. The claims generally included at least one (and usually more) of the following additional defects: (1) incorrect CLIA number; (2) incorrect NPI; (3) incorrect place-of-service; and (4) incorrect date-of-service. Based on Blue Cross's review, out of the many thousands of claims GS Labs submitted to Blue Cross there are virtually no "clean" claims—*i.e.*, claims free of material error. Few (if any) of the claims GS Labs submitted appear to be totally accurate as compared to the medical records GS Labs produced.

116. A specific example of a false or misleading claim is below:

| Member: ███████████ | | | |
| DOS: 5/5/2021 | | | |
| Claim No. | Proc Code | Billed Amount | Paid Amount |
| --- | --- | --- | --- |
| ███████████ | 0202U | $ 979.00 | $ 979.00 |
| ███████████ | G2023 | $ 50.00 | $ 16.61 |
| | 87811 | $ 380.00 | $ 380.00 |
| | 86328 | $ 380.00 | $ 380.00 |

117. Based on Blue Cross's findings with respect to the foregoing claims, most (if not all) of the claims GS Labs submitted to Blue Cross are not payable in whole or in part.

118. Based on the foregoing, and on information and belief, much (if not all) of the claims GS Labs has submitted to Blue Cross pertain to testing was: (1) induced by coercion or misinformation and wasteful or inappropriate; (2) unauthorized by a physician's order; and/or (3) faulty and unreliable. Moreover, on information and belief, in some cases GS Labs did not actually perform the testing for which it billed Blue Cross at all. GS Labs presently has exclusive possession of the records that would enable Blue Cross to determine conclusively the full universe of such claims.

119. Similarly, based on the foregoing, and on information and belief, most (if not all) of GS Labs' claims are not payable because they include material falsehoods and inaccuracies, and are not properly subject to Section 3202 of the CARES Act. Again, GS Labs presently has exclusive possession of the records that would enable Blue Cross to determine conclusively the full universe of such claims.

34

120. Notably, Gabriel Sullivan, one of GS Labs' members, faces a lawsuit brought by a former employer alleging similar misconduct. The complaint in that case states that Sullivan was "responsible for patient services and billing," and "failed to implement policies and procedures that . . . w[ere] in compliance with the contractual requirements and billing policies of insurance companies." Instead, Sullivan "intentionally implemented [billing] procedures that he knew were not compliant with insurance company requirements," leading an insurer to assess an overpayment "in excess of $1.9 million." It further cites an email that Sullivan allegedly sent stating his intent to "beat [insurers] at their own game and out smart [sic] them" with billing practices that "do[n't] follow their personal guidelines."[37]

121. GS Labs submitted all of the claims at issue demanding payment at its false and exorbitant "cash prices," discussed above. To the extent the claims are payable at all, they are not payable at these inflated rates. These rates are not required by the CARES Act nor by any other source of law. Blue Cross did not agree to pay these rates (whether explicitly or impliedly), and these rates far exceed the fair market value of GS Labs' work.

122. Blue Cross paid GS Labs millions of dollars on claims for COVID tests for which nothing or substantially less was owed.

123. GS Labs contends that it is entitled to payment of millions of dollars more on the claims that remain pending. But as discussed above, many of these claims are not

---

[37] Complaint ¶¶ 38-40, *LMMC, LLC, et al. v. Sullivan, et al.*, Case No. 8:19-cv-00560 (D. Neb. Dec. 23, 2019).

payable at all, and to the extent they are, GS Labs is not entitled to payment at the exorbitant rates it demands.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF MINNESOTA CONSUMER FRAUD ACT, MINN. STAT. § 325F.69

124. Blue Cross hereby incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

125. The Minnesota Consumer Fraud Act ("MCFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69.

126. The Minnesota Private Attorney General Statute (Minn. Stat. § 8.31, subd. 3(a)) allows Blue Cross to bring a claim under the MCFA.

127. The term "merchandise" within the meaning of the MCFA includes "services" such as GS Labs' COVID-19 testing services. Minn. Stat. § 325F.68, subd. 2.

128. The term "person" includes "any natural person or legal representative, partnership, corporation (domestic and foreign) company, trust, business entity, or association, and any agent, employee, salesperson, partner, officer, director, member, stockholder, associate, trustee, or cestui que thereof." Minn. Stat. § 325F.68, subd. 3. GS Labs is a "person" within the meaning of the statute.

129. GS Labs engaged in a variety of deceptive and fraudulent practices within the meaning of the MCFA, with the intent that others—including Blue Cross—rely on those deceptions in connection with the sale of its sale of COVID-19 testing services. These include:

    a.   Misleading patients as to the medical necessity and propriety of performing multiple COVID-19 tests, thus inducing them to undergo unnecessary and expensive testing, in order to obtain higher payments from insurers;

    b.   Misleading patients as to the capabilities of rapid antibody testing, thus inducing them to undergo unnecessary and expensive testing, and creating the risk that some patients may falsely believe themselves to be immune to COVID-19, in order to obtain higher payments from insurers;

    c.   Misleading patients as to the circumstances under which rapid antibody testing is covered by insurance, in order to obtain higher payments from insurers;

    d.   Posting false and deceptive "cash prices" in an effort to mislead the public, including insurers like Blue Cross, as to the "cash prices" it charges for COVID-19 testing, in order to obtain higher payments from insurers; and

    e.   Systematically submitting false and misleading claims to health insurers in Minnesota that misrepresent patient diagnoses, the medical necessity of the testing performed, the medical authorization to perform the tests, and in some cases, the tests actually performed, among other inaccuracies.

130. The foregoing practices were, and remain, likely to mislead reasonable consumers, and did in fact deceive the public. These practices had the capacity to mislead, and did in fact deceive, not only patients seeking COVID-19 testing, but also insurers throughout Minnesota.

131. GS Labs' misconduct affects the public interest. GS Labs subjected many Minnesota residents to expensive, wasteful, unnecessary, and unauthorized testing without informed consent. GS Labs further misled many members of the public as to the purpose and capability of the tests administered—in particular, the diagnostic value of rapid antibody testing.

132. GS Labs' submission of false and misleading insurance claims further affects the public interest.

133. Finally, GS Labs' maintenance of false "cash prices" on its website affects the public interest. CMS has explained that the requirement that providers maintain accurate cash prices on their website is necessary to ensure transparency for "the public, including group health plans and health insurance issuers offering group or individual health insurance coverage that must provide reimbursement for COVID-19 diagnostic testing pursuant to the requirements of section 3202(a) of the CARES Act."[38]

134. The conduct described above has a real and substantial potential for repetition—GS Labs has consistently engaged in the conduct described above throughout the period it has operated in Minnesota and, while it may have changed some of its unfair

---

[38] 85 FR at 71153.

and deceptive practices in early January 2022, it has not disclaimed or offered any assurances that it will not return to those practices.

135. GS Labs further advertises to the public, and has actively solicited both patronage by patients and payments by insurers like Blue Cross. GS Labs has unequal bargaining power by virtue of the exigent circumstances created by the COVID-19 pandemic.

136. Moreover, the Minnesota Attorney General's Office has filed a lawsuit against another COVID-19 testing company for similar practices, including for falsely reporting test results and timeframes for test results.[39] The lawsuit alleges violations of the MCFA, among other claims. The foregoing reflects the strong public policy in Minnesota against price gouging for COVID-19 testing during the pandemic.

137. GS Labs' fraudulent and deceptive acts and practices injured Blue Cross. Blue Cross has paid millions of dollars on claims GS Labs submitted. Blue Cross paid GS Labs millions of dollars on claims for COVID tests for which nothing or substantially less was owed. Moreover, GS Labs has forced Blue Cross to expend significant resources on investigating and addressing the misconduct detailed above, as well as in addressing GS Labs' demands for exorbitant payments.

138. GS Labs' unfair and deceptive acts and practices directly and proximately caused Blue Cross's injuries. GS Labs caused these injuries by, among other things,

---

[39] *See* Complaint, *State of Minn. v. Center for COVID Control, LLC & Doctors Clinical Lab., Inc.*, Case No. 27-CV-22731 (Minn. Dist. Ct. Jan. 19, 2022), https://tinyurl.com/29hhjk64.

(1) causing patients to undergo wasteful, inappropriate, and unauthorized testing;

(2) submitting false and misleading insurance claims to Blue Cross related to that testing;

and (3) demanding payment from Blue Cross at false and exorbitant "cash prices," while

concealing its true "cash prices."

139. By virtue of the foregoing, Blue Cross is entitled to its damages, an

injunction prohibiting GS Labs from continuing to engage in the unlawful and inequitable

practices described above and enjoining it from seeking payment from Blue Cross's

members, and its attorneys' fees and costs.[40]

## COUNT II: MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. § 325D.43, *et seq.*

140. Blue Cross hereby incorporates the foregoing paragraphs as if fully set forth

herein and further alleges as follows.

141. The Minnesota Uniform Deceptive Trade Practices Act ("MDTPA") provides

in part:

A person engages in a deceptive trade practice when, in the course of business,

vocation, or occupation, the person:

. . .

(5) represents that goods or services have sponsorship, approval,

characteristics, ingredients, uses, benefits, or quantities that they do not have

or that a person has a sponsorship, approval, status, affiliation, or connection

that the person does not have;

---

[40] Minn. Stat. §§ 8.31, 325F.69.

. . .

(7) represents that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of another;

. . .

and (13) engages in any other conduct which similarly creates a likelihood of

confusion or of misunderstanding.

Minn. Stat. § 325D.44, subd. 1.

142. GS Labs has engaged in a variety of deceptive trade practices in the course of

business within the meaning of the MDTPA. These include:

    a.   Posting false and deceptive "cash prices" in an effort to mislead the public,

           including insurers like Blue Cross, as to the "cash prices" it charges for

           COVID-19 testing, in order to obtain higher payments from insurers;

    b.   Systematically submitting false and misleading claims to health insurers in

           Minnesota that misrepresent patient diagnoses, the medical necessity of the

           testing performed, the medical authorization to perform the tests, and in

           some cases, the tests actually performed, among other inaccuracies;

    c.   Misleading patients as to the medical necessity and propriety of performing

           multiple COVID-19 tests, thus inducing them to undergo unnecessary and

           expensive testing, in order to obtain higher payments from insurers;

    d.   Misleading patients as to the capabilities of rapid antibody testing, thus

           inducing them to undergo unnecessary and expensive testing, and creating

the risk that some patients may falsely believe themselves to be immune to

COVID-19, in order to obtain higher payments from insurers; and

e. Misleading patients as to the circumstances under which rapid antibody

testing is covered by insurance, in order to obtain higher payments from

insurers.

143. The foregoing practices were, and remain, likely to mislead reasonable consumers, and did in fact deceive the public. These practices had the capacity to mislead, and did in fact deceive, not only patients seeking COVID-19 testing, but also insurers throughout Minnesota.

144. The conduct described above has a real and substantial potential for repetition—GS Labs has consistently engaged in the conduct described above throughout the period it has operated in Minnesota, and continues to engage in the above conduct today.

145. GS Labs further advertises to the public, and has actively solicited both patronage by patients and payments by insurers like Blue Cross. GS Labs has unequal bargaining power by virtue of the exigent circumstances created by the COVID-19 pandemic.

146. Moreover, as discussed above, the Minnesota Attorney General's Office has filed a lawsuit against another a COVID-19 testing company for similar practices,

including for falsely reporting test results and timeframes for test results.[41] The lawsuit alleges violations of the MDTPA, in addition to the MCFA. The foregoing reflects the strong public policy in Minnesota against price gouging for COVID-19 testing during the pandemic.

147. GS Labs' fraudulent and deceptive acts and practices injured Blue Cross. Blue Cross has paid millions of dollars on claims GS Labs submitted. Blue Cross did not owe and should not have paid some (or all) of that amount due to the foregoing misconduct. Moreover, GS Labs has forced Blue Cross to expend significant resources on investigating and addressing the misconduct detailed above, as well as in addressing GS Labs' demands for exorbitant payments.

148. GS Labs' unfair and deceptive acts and practices directly and proximately caused Blue Cross's injuries. GS Labs caused these injuries by, among other things, (1) causing patients to undergo wasteful, inappropriate, and unauthorized testing; (2) submitting false and misleading insurance claims to Blue Cross related to that testing; and (3) demanding payment from Blue Cross at false and exorbitant "cash prices," while concealing its true "cash prices."

149. By virtue of the foregoing, Blue Cross is entitled to its an injunction prohibiting GS Labs from continuing to engage in the unlawful and inequitable practices

---

[41] *See* Complaint, *State of Minn. v. Center for COVID Control, LLC & Doctors Clinical Lab., Inc.*, Case No. 27-CV-22731 (Minn. Dist. Ct. Jan. 19, 2022), https://tinyurl.com/29hhjk64.

described above and enjoining it from seeking payment from Blue Cross's members, and its attorneys' fees and costs.[42]

### COUNT III: FRAUD

150. Blue Cross hereby incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

151. Between February 2021 and the present, GS Labs submitted over 190,000 claims to Blue Cross for COVID-19 testing utilizing a CMS-1500 form or its electronic equivalent.

152. In doing so, GS Labs made numerous representations of present facts:

   a. GS Labs represented with every claim, in conjunction with its website, that the prices it charged and billed were its "cash prices" for purposes of the CARES Act.

   b. GS Labs represented implicitly and explicitly that the testing was "diagnostic" testing within the meaning of the CARES Act.

   c. GS Labs certified, expressly and impliedly, that the services it rendered were appropriate and authorized.

153. The foregoing facts were material to Blue Cross's payment of claims for GS Labs' COVID-19 testing services. GS Labs intended that Blue Cross rely on each piece of information in paying claims for its COVID-19 testing services.

154. The foregoing representations were false.

---

[42] Minn Stat. § 325D.45.

44

a. The prices GS Labs charged Blue Cross for its COVID-19 tests were not its "cash prices" within the meaning of the CARES Act.

b. GS Labs submitted claims performed for non-diagnostic purposes.

c. Many of the tests GS Labs performed and billed to Blue Cross were not appropriate or authorized by a physician's order.

155. GS Labs knew that the foregoing representations of fact that it included in its claims to Blue Cross were false, or at least knew that it had no reasonable basis to believe in the truth of the foregoing representations.

156. GS Labs intended that Blue Cross would act on these representations in paying the insurance claims it submitted to Blue Cross. GS Labs further intended to obtain payments from Blue Cross to which it was not entitled.

157. Blue Cross did not know that the foregoing representations were false, and relied on these representations in paying claims submitted by GS Labs.

158. Blue Cross had a right to assume the truthfulness of the information GS Labs included in the claims it submitted to Blue Cross.

159. Blue Cross has paid millions of dollars on claims GS Labs submitted. Blue Cross did not owe and should not have paid some (or all) of that amount, and suffered damages to the extent that it overpaid GS Labs. Blue Cross overpaid on these claims due to GS Labs' fraud.

160. GS Labs presently has exclusive possession of medical records that will conclusively establish the full universe of claims tainted by the above misrepresentations.

## COUNT IV: ERISA § 502(a)(3) & 28 U.S.C. §§ 2201 & 2202

161. Blue Cross hereby incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

162. Blue Cross acts as claims administrator and has been delegated the authority to pursue recovery of payments made by Blue Cross on behalf of certain self-funded plans covered by ERISA. Blue Cross has standing to sue under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for declaratory and injunctive relief to enjoin any acts or practices that violate the provisions of the plans and to obtain other appropriate relief to redress violations of and enforce plan terms.

163. The ASO plans at issue in this litigation covered by ERISA include the following or substantially similar language: "Blue Cross or an Affiliate may, at its election, and as agent for any fiduciary Employer/Plan, pursue claims of Employer/Plan that are related to claims that Blue Cross or an Affiliate pursues on its own behalf in class action litigation or federal multi-district litigation, and litigation sounding in or alleging violations of law relating to: antitrust, deceptive trade practices, false or fraudulent advertising, consumer fraud, breach of fiduciary duty, breach of contract, breach of covenant of good faith and fair dealing, torts (including fraud, negligence, and product liability), breach of warranty, false claims, kickback, conversion, theft and/or the Racketeer Influence Corrupt Organizations Act (RICO)."

164. Blue Cross will provide additional information regarding the specific plans and claims at issue in this litigation following the entry of a HIPAA qualified protective order.

165. GS Labs has systematically submitted false and misleading insurance claims to Blue Cross's ERISA plans seeking reimbursement for wasteful, inappropriate, and unauthorized testing, at exorbitant prices, as detailed above.

166. GS Labs' practices are deceptive, unfair, and unlawful.

167. Blue Cross is entitled under ERISA to the return of the funds it paid from its ERISA plans to GS Labs or to offset money owed on new claims to recover overpayments made on prior claims.

168. Any claims that Blue Cross has denied, are pending, or that GS Labs may submit in the future that were or are tainted by the conduct described above are not payable and void.

169. There is a *bona fide*, present need for a declaration as to the unlawfulness of GS Labs' conduct. Blue Cross is entitled to a judgment declaring that GS Labs' practices, as described above, violate the terms of Blue Cross's ERISA plans and are not payable and void.

170. Blue Cross further seeks an order enjoining GS Labs from continuing to submit false and misleading insurance claims to Blue Cross's ERISA plans seeking reimbursement for wasteful, inappropriate, and unauthorized testing, at exorbitant prices, as detailed above.

171. Finally, Blue Cross seeks recovery of its reasonable attorneys' fees and costs, under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

**COUNT V: DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**

172. Blue Cross incorporates by reference the above paragraphs as if fully set forth herein and further alleges as follows.

173. There is an actual, substantial, and present controversy between GS Labs and Blue Cross concerning the amount of payment (if any) due in connection with claims submitted by GS Labs to Blue Cross for COVID-19 testing that are currently pending, and with respect to the claims that GS Labs continues to submit.

174. *First*, to the extent that the claims GS Labs has submitted are payable at all, there is a controversy as to whether Blue Cross is obligated to pay the rates GS Labs demands—*i.e.*, GS Labs' exorbitant claimed "cash prices" under the CARES Act.

175. *Second*, there is a controversy as to Blue Cross's obligation to pay for COVID-19 testing that it contends was abusive, inappropriate, and unauthorized for the reasons detailed herein.

176. *Third*, there is a controversy as to Blue Cross's obligation to pay claims submitted by GS Labs to the extent those claims include material falsehoods, as detailed above.

177. *Fourth*, there is a controversy as to Blue Cross's obligation to pay for COVID-19 testing that GS Labs admits was tainted by "deviat[ions] from applicable laboratory standards for testing facilities" that "may have impacted [patients'] test results."

178. Blue Cross and GS Labs have adverse legal interests. GS Labs contends that it is entitled to payment in full from Blue Cross totaling millions of dollars for its pending claims, and that it may pursue this amount from Blue Cross through litigation. Although

GS Labs has not specifically informed Blue Cross of the legal basis for its potential claims, GS Labs has filed claims against other insurers under materially identical circumstances that include purported claims under the CARES Act, a variety of equitable and quasi-contractual claims, and negligence per se.[43] On information and belief, GS Labs intends to assert these same or similar claims against Blue Cross. Were GS Labs to bring these claims against Blue Cross, the parties' complete diversity and the amount in controversy would satisfy the prerequisites for subject matter jurisdiction in this Court.

179. Blue Cross contends that it is obligated to pay only a fraction of the claims GS Labs has submitted that remain pending, if any, due to the misconduct detailed above. Blue Cross further contends that, to the extent it is obligated to pay at all, it need only pay the fair market value of GS Labs' COVID-19 testing, as opposed to the exorbitant rates GS Labs demands.

180. GS Labs continues to submit claims to Blue Cross that raise these same disputes.

181. The controversies between GS Labs and Blue Cross are substantial and of sufficient immediacy and reality to warrant declaratory relief. As discussed above, GS Labs has recently asserted claims against other insurers with which it could not reach agreements under similar circumstances.

---

[43] *See* Complaint, *GS Labs, LLC v. Medica Ins. Co.*, Case No. 0:21-cv-02400 (D. Minn. Oct. 28, 2021); *see also* Answer & Counterclaims, *Blue Cross and Blue Shield of Kansas City v. GS Labs, LLC*, Case No. 21-cv-00525 (W.D. Mo. Aug. 5, 2021).

182. Accordingly, there is a bona fide, actual, present, and practical need for a declaration based upon the foregoing with respect to the claims GS Labs has submitted to Blue Cross that remain pending, as well as the claims that GS Labs continues to submit to Blue Cross. GS Labs' demands for payment have created a cloud of legal uncertainty as to Blue Cross's liability with respect to an ever-growing number of claims for COVID-19 testing, and Blue Cross faces a present threat of litigation. Blue Cross thus requests a judgment be entered declaring the following:

    a.  Neither Blue Cross, nor its members, need pay claims submitted by GS Labs pertaining to wasteful, inappropriate, and unauthorized testing, as described above;

    b.  Neither Blue Cross, nor its members, need pay claims submitted by GS Labs that include material falsehoods, as detailed above;

    c.  Neither Blue Cross, nor its members, need pay claims submitted by GS Labs that have been tainted by "deviat[ions] from applicable laboratory standards for testing facilities" that "may have impacted [patients'] test results," or other unacceptable lapses in quality and reliability; and

    d.  To the extent the claims GS Labs submits are payable at all, Blue Cross is not obligated under any source of law to pay the rates GS Labs claims to be its "cash prices," but need only pay rates in accordance with the respective plans.

## COUNT VI: UNJUST ENRICHMENT

183. Blue Cross hereby incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

184. GS Labs knowingly received and accepted a benefit in the form of payments for COVID-19 testing from Blue Cross.

185. GS Labs received this benefit at Blue Cross's expense.

186. The circumstances are such that it would be unjust for GS Labs to retain this benefit.

187. In particular, it is unjust that GS Labs retain payments Blue Cross made due to a mistake of fact where the testing for which Blue Cross paid was:

a. Wasteful, abusive, unauthorized, or rendered contrary to prevailing medical guidance;

b. Tainted by material lapses in quality control; or

c. Otherwise not subject to coverage.

188. GS Labs' conduct in connection with these payments was inequitable and unlawful, as detailed above.

189. Accordingly, in equity and good conscience, Blue Cross is entitled to the return of funds it paid to GS Labs under the foregoing circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Blue Cross respectfully requests an award in its favor and granting the following relief:

a. Damages as requested herein;

b.   Declaratory relief as requested herein;

c.   Injunctive relief as requested herein;

d.   An award of attorneys' fees;

e.   Prejudgment and post-judgment interest; and

f.   An award of any other relief in law or equity that the Court deems just and

proper.

Dated: March 1, 2022            **ROBINS KAPLAN LLP**

By:  *s/ Jeffrey S. Gleason*
Jeffrey S. Gleason, #0396190
Charlie C. Gokey, #0402225
Geoffrey H. Kozen, #0398626
Stephanie A. Chen, #0400032
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
T: (612) 349–8500
F: (612) 339–4181
jgleason@robinskaplan.com
cgokey@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com

*Counsel for Plaintiff Blue Cross and Blue Shield of Minnesota*