## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| BCBSM, Inc., *a Minnesota nonprofit corporation, on behalf of itself and its self-insured groups d/b/a* Blue Cross and Blue Shield of Minnesota, | File No. 22-cv-513 (ECT/DJF) |
| Plaintiff and Counter-Defendant, | **OPINION AND ORDER** |
| v. | |
| GS Labs, LLC, | |
| Defendant and Counterclaimant. | |

Charles Gokey, Geoffrey H. Kozen, Jeffrey Sullivan Gleason and Stephanie Alicia Chen, Robins Kaplan LLP, Minneapolis, MN for Plaintiff and Counter-Defendant BCBSM, Inc.

Kyle R. Kroll, Thomas H. Boyd, David M. Aafedt and Christianna L. Finnern, Winthrop & Weinstine, PA, Minneapolis, MN, and Kajetan Rozga, Yonaton M. Rosenzweig and Adam Sieff, Davis Wright Tremaine, LLP, Los Angeles, CA for Defendant and Counterclaimant GS Labs, LLC.

---

This case began with a dispute over payment for COVID-19 diagnostic testing. Defendant and Counterclaimant GS Labs claims to have provided COVID diagnostic tests to over 300,000 Minnesotans, more than 70,000 of whom were insured, or had insurance administered by, Plaintiff and Counter-Defendant BCBSM ("Blue Cross"). GS Labs says that the tests it provided were necessary, high-quality, and contributed positively to the nation's pandemic response. Blue Cross, on the other hand, says GS Labs is a pandemic profiteer that charged unreasonably high prices for unnecessary, faulty tests.

Blue Cross brought the case. It asserts one claim under federal law and four claims under Minnesota law. It seeks damages comprised of the millions of dollars it has paid GS Labs and additional sums it has incurred to address GS Labs' alleged misconduct. Blue Cross also seeks a declaration that it is not legally obligated to pay GS Labs for outstanding claims, an injunction essentially forbidding GS Labs from seeking payment from Blue Cross members and plans, and attorneys' fees and costs.

GS Labs responded to Blue Cross's Complaint with an Answer and Counterclaim, and it has since amended the Counterclaim. The Amended Counterclaim has twenty-one counts. In seven of these, GS Labs asserts claims arising under federal law, including the CARES Act, ERISA, the Lanham Act, and the Sherman Act. In twelve counts, GS Labs asserts claims under Minnesota law.[1] The remaining two counts describe requested remedies: a declaratory judgment and punitive damages. For relief, GS Labs seeks reimbursement for diagnostic testing services it provided to individuals covered under benefit plans insured or administered by Blue Cross, millions in additional damages it claims to have incurred as a result of Blue Cross's conduct, treble antitrust damages, punitive damages, declaratory relief, and attorneys' fees and costs.

Blue Cross has filed a motion seeking dismissal of GS Labs' Amended Counterclaim in its entirety under Federal Rule of Civil Procedure 12(b)(6). The short version of a longer story is that most of GS Labs claims will be dismissed. Left to proceed

---

[1] The Amended Counterclaim references Minnesota law specifically for statutory claims, but not claims under the common law. Though GS Labs' allegations imply that the case may have connections to other states, GS Labs made clear at the hearing on this motion that it asserts all of its state claims under Minnesota law.

will be GS Labs' claims for promissory estoppel and for benefits due under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B).

*

*This order's structure.*   This order addresses GS Labs' 21 claims in the order they appear in the Amended Counterclaim.   Though some claims might reasonably have been grouped together—that is how the parties approached the problem—each claim is analyzed separately.   The Roman numeral appearing at the beginning of each section corresponds to the Count being analyzed.   Rather than provide a detailed facts section up front, the relevant factual allegations will be described as each Count is analyzed.   Regardless, a few basic background facts deserve mention up front to provide context.

*Basic background facts.*   GS Labs was formed in January 2020.   Am. Countercl. [ECF No. 22] ¶ 16.   When the COVID pandemic began, GS Labs entered the diagnostic testing market, developing infrastructure and opening and staffing over fifty COVID testing sites across the country, including eleven in Minnesota.   *Id.* ¶¶ 17–22, 24.   Blue Cross is a health insurer and an administrative services provider to self-funded health plans. *Id.* ¶ 72.   Under these third-party health plans, also known as Administrative Services Only or "ASO" plans, the plan funder assumes the risk of the plan and contracts with an insurance company (here, Blue Cross) to provide administrative services and manage the plan's day-to-day operations.   *Id.* ¶ 73.   GS Labs, without requiring prepayment, performed thousands of COVID-19 tests for Blue Cross insureds or for persons whose plans Blue Cross administered.   *Id.* ¶¶ 40, 78.   GS Labs submitted its first request for reimbursement to Blue Cross on December 22, 2020.   *Id.* ¶ 41.   Blue Cross reimbursed GS Labs for a time,

3

but eventually stopped paying because of the allegations it makes in this case.  *See id.* ¶¶ 43–48; 58; 61–62.

*The familiar Rule 12(b)(6) standards.*  In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court need not, however, accept as true wholly conclusory allegations or legal conclusions couched as factual allegations.  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).  Matters outside the pleadings are also not ordinarily considered on a motion to dismiss.  *See* Fed. R. Civ. P. 12(d).  This includes "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings."  *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999).  A court may, however, consider exhibits attached to the pleadings, materials embraced by the pleadings, and matters of public record.  *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011).

4

I

In Count I, GS Labs asserts a claim under § 3202 of the Coronavirus Aid, Relief,

and Economic Security (or "CARES") Act.  Am. Countercl. ¶¶ 273–308.  The issue is

whether § 3202 creates a private right of action.  Section 3202 reads:

> **SEC. 3202. PRICING OF DIAGNOSTIC TESTING.**
>
> (a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:
>
> (1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.
>
> (2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.
>
> (b) REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—
>
> (1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider.
>
> (2) CIVIL MONETARY PENALTIES.—The Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing.

Pub. L. No. 116-136, § 3202, 134 Stat. 281, 367 (2020).  The section of the Families First

Coronavirus Response Act (or "FFCRA") referenced in § 3202(a) requires group health

plans and their insurers to "provide coverage," and forbids them from imposing "cost

sharing" or "prior authorization or other medical management requirements," for FDA-

approved "diagnostic products . . . for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19." Pub. L. No. 116-127, § 6001(a), 134 Stat. 178, 201–02 (2020).

As factual support for this claim, GS Labs alleges that it has no negotiated reimbursement rate with Blue Cross. Am. Countercl. ¶ 305. It contends that § 3202 entitles it to receive reimbursement at whatever price it published on its website and gives it a cause of action to obtain amounts due from group health plans or their insurers. *See id.* ¶ 303.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.*; *see also Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979) ("The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction."). "It is now clear that the proper focus is on congressional intent, and nothing short of an unambiguously conferred right will support an implied right of action." *Osher v. City of St. Louis,* 903 F.3d 698, 702 (8th Cir. 2018) (cleaned up). "It is insufficient to show merely that a particular statute intended to benefit the putative plaintiff." *Id.* (cleaned up).

The better answer is that § 3202 does not create a private remedy. This is so for several reasons: (1) The statute authorizes no judicial proceeding. (2) Neither does it define a class that may bring suit. (3) That part of the statute concerning reimbursement (on which GS Labs chiefly relies) focuses on health plans and health insurance issuers, not on

providers like GS Labs.  The statute, in other words, "does not contain rights-creating language that is phrased in terms of the persons benefitted." *Id.* at 702 (cleaned up).  (4) The statute's only identified enforcement mechanism empowers the Secretary of Health and Human Services to impose a specified civil monetary penalty on providers who do not comply with the requirement that they publicize the cash price for testing "on a public internet website of such provider."  This seems significant because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others[,]" *Alexander*, 532 U.S. at 290, and because the enforcement method Congress created runs the opposite direction of the remedy GS Labs seeks to imply.

This determination falls in line with the majority of courts that have addressed the issue.  Though neither the Supreme Court nor the Eighth Circuit have addressed this question, at least five district courts have, and four of those have determined that § 3202 does not create a private right of action for providers.  *Compare GS Labs, Inc. v. Medica Ins. Co.*, No. 21-cv-2400 (SRN/TNL), 2022 WL 4357542, at *3–12 (D. Minn. Sept. 20, 2022); *Saloojas Inc. v. Blue Shield of Cal. Life & Health Ins. Co.*, No. 22-cv-3267-MMC, 2022 WL 4843071, at *1 (N.D. Cal. Oct. 3, 2022); *Saloojas, Inc. v. Aetna Health of Cal., Inc.*, No. 22-cv-01696-JSC, 2022 WL 2267786, at *2–5 (N.D. Cal. June 23, 2022); *and Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20cv1675, 2022 WL 743088, at *2–6 (D. Conn. Mar. 11, 2022), *with Diagnostic Affiliates of Ne. Hou, LLC v. United Healthcare Servs., Inc.*, No. 2:21-cv-00131, 2022 WL 214101, at *3–9 (S.D. Tex. Jan. 18, 2022).

GS Labs advances several arguments to show that § 3202 creates a private right of action. Most of these are addressed in the analysis above and in the cases cited in the preceding paragraph holding that § 3202 does not create a private right of action. Two contentions deserve additional attention.

First, GS Labs argues that § 3202(a)'s lack of an enforcement mechanism is an implicit indication of Congressional intent to create a private right of action. Mem. in Opp'n [ECF No. 47] at 13–18. As support for this argument, GS Labs relies on *Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944). There, the Supreme Court held that when Congress issues a statutory command with no enforcement mechanism "other than resort to the courts," courts have the "jurisdiction and duty to afford a remedy for a breach of statutory duty." *Id.* at 207. *Steele*, however, is emblematic of an era during which courts held and applied a considerably broader view of implied causes of action. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). Binding precedent today counsels caution in implying causes of action and directs that the focus be on statutory intent. *See id.*; *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58, 63 (8th Cir. 2014). The determination that § 3202 creates no private right off action is more faithful to the modern, controlling approach.

Second, GS Labs refers to parts of the CARES Act's legislative history that it alleges support implying a private right of action. Am. Countercl. ¶¶ 282–88. The history on which GS Labs relies consists largely of legislators' statements emphasizing the importance of testing to address the COVID-19 pandemic. *See id.* The "ordinary problems with relying on legislative history—no bicameralism and presentment, focus on 'intent'

rather than meaning, unfamiliarity of legislators with the material, and so forth" are widely recognized. *United States v. Mast*, 938 F.3d 973, 979–80 (8th Cir. 2019) (Colloton, J., dissenting) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 369–90 (2012)). These ordinary problems aside, the legislative history GS Labs identifies addresses the wisdom of testing from many perspectives, but none of this history is specific to § 3202, much more the question whether § 3202 creates the private right of action GS Labs seeks to assert here. GS Labs' claim under the CARES Act (Count I) will be dismissed because § 3202 creates no private right of action for the recovery of unpaid or underpaid diagnostic-testing charges.

## II

The declaratory judgment GS Labs seeks in Count II is derived from and concerns the same issue as Count I—whether § 3202 creates a private right of action. *See* Am. Countercl. ¶¶ 309–14. Therefore, this claim also will be dismissed. *See Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017) (recognizing that the Declaratory Judgment Act, 28 U.S.C. § 2201, "cannot be used as an independent cause of action" when the underlying statute contains no private right of action).

## III

GS Labs asserts a typical breach-of-contract claim in Count III. Under Minnesota law, the elements of a breach-of-contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). "The formation of a contract requires

communication of a specific and definite offer, acceptance, and consideration." *E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 307 F. Supp. 3d 952, 970 (D. Minn. 2018).

GS Labs alleges that it had a contract with Blue Cross under which Blue Cross "agreed to pay GS Labs at the cash prices publicly posted on GS Labs' website." Am. Countercl. ¶ 317.  To show formation of this contract, GS Labs alleges that a Blue Cross employee, Senior Provider Contract Manager Kevin L. Jones, emailed GS Labs on March 31, 2021, stating that Blue Cross "declines to negotiate rates for these services and will reimburse eligible services per your pricing as listed on the GS Labs website as required by section 3202 of the CARES Act."  *See id.*; ECF No. 38-2.  "Mr. Jones also asked GS Labs to register as an 'out-of-network provider'. . . by completing a registration form." Am. Countercl. ¶ 317.  GS Labs alleges that it accepted this "offer" when it "filled out the registration form requested by Blue Cross."  *Id.* ¶ 318.  GS Labs alleges that Blue Cross breached this contract when it "abruptly backtracked on its agreement to pay the cash prices posted on GS Labs' website in August 2021."  *Id.* ¶ 322.

The email on which the claim depends cannot plausibly be understood as an offer by Blue Cross to contract with GS Labs.  The email's author explicitly disclaimed an intent to contract when he wrote that Blue Cross "declines to negotiate rates for these services." The author's statement that Blue Cross would pay "as required by section 3202 of the CARES Act" expressed an "at-this-time" intention to comply with the law as Blue Cross understood it.  The email neither required nor invited formation of a contract to follow through on that intention.  Instead, the email invited GS Labs to register as an "out-of-network" provider.  But the registration form implies, ECF No. 38-3, and cases confirm,

that non-participating, out-of-network providers generally do not have contracts with insurers. *See, e.g.*, *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 469 (5th Cir. 2018) ("In-network providers contract with Aetna to provide services at pre-arranged reimbursement rates in exchange for access to Aetna's members as patients. Out-of-network providers do not; they have no contract with Aetna and instead set their own fees for services."); *Weight Loss Healthcare Ctrs. of Am., Inc. v. Off. of Pers. Mgmt.*, 655 F.3d 1202, 1208 (10th Cir. 2011) ("Non-participating providers have no contract with Blue Cross."). GS Labs' allegations confirm—and plainly do not refute—the presence of this non-contractual out-of-network relationship here.

IV

To state a promissory estoppel claim, GS Labs must allege facts plausibly showing that (1) a clear and definite promise was made; (2) the promisor intended to induce reliance and the promisee in fact relied to its detriment; and (3) the promise must be enforced to prevent injustice. *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). Promissory estoppel "impl[ies] a contract in law where none exists in fact." *Grouse v. Grp. Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn. 1981). "The second element of promissory estoppel is satisfied when the promisor should reasonably have expected to induce the promisee's reliance, and the promisee reasonably relies to its detriment." *Heffron v. Burlington N. & Santa Fe. Ry. Co.*, No. A11-2039, 2012 WL 3262968, at *4 (Minn. Ct. App. Aug. 6, 2012); *accord Myrlie v. Countrywide Bank*, 775 F. Supp. 2d 1100, 1107 (D. Minn. 2011).

11

GS Labs' promissory-estoppel theory is straightforward.  It alleges that Blue Cross promised "to pay GS Labs at the cash prices publicly posted on GS Labs' website, as required by the CARES Act, in its email dated March 31, 2021."  Am. Countercl. ¶ 327.  GS Labs alleges that it relied on this promise to its detriment when it "filled out the registration form requested by Blue Cross[,]" and when it "provided COVID-19 diagnostic testing to Blue Cross[] insureds" and billed Blue Cross for those services.  *Id.* ¶ 329.  And GS Labs alleges that "[t]he injustice of Blue Cross'[s] conduct, and that conduct's unjust effects, can be avoided by enforcement of Blue Cross'[s] promise."  *Id.* ¶ 332.

Though it is a close call, I conclude this claim is plausible.  Whether the statement on which GS Labs relies is a "clear and definite promise" seems fairly debatable.  In Blue Cross's favor, the statement includes no mention of the promise's duration and the author's use of the phrase "at this time" implies obvious hedging.  In GS Labs' favor, the "at this time" phrase might reasonably be understood to apply only to Blue Cross's unwillingness "to negotiate rates" and not to Blue Cross's commitment to reimburse per GS Labs' website-listed pricing.  The promise to pay "as required by section 3202 of the CARES Act" begs the question of what precisely § 3202 required.  But the email thread preceding the promise included a link to GS Labs' website pricing and CPT coding, *see* ECF No. 38-2 at 2–3, and the plausible inference is that the promise's author reviewed that pricing and related information on GS Labs' website before committing to pay "per your pricing as listed on GS Labs website[,]" *id.* at 2.  Regarding the reliance element, Blue Cross has a point: GS Labs hasn't alleged what, if anything, it did *differently* after receiving Blue Cross's promise.  GS Labs' theory seems to be that it continued business-as-usual to

provide diagnostic testing services to Blue Cross insureds. GS Labs does not allege explicitly that it would have stopped providing these services but for Blue Cross's promise, but that seems to be the point. It makes practical sense that continuing a business relationship based on a promise plausibly may count as reliance for purposes of a promissory estoppel claim. No authority has been cited that might undermine this commonsense notion, and some Minnesota authorities support the understanding that both an affirmative change of position and forbearance may show reliance for purposes of a promissory estoppel claim. *See Meriwether Minn. Land & Timber, LLC v. State*, 818 N.W.2d 557, 567 (Minn. Ct. App. 2012) ("The promise must be such that it 'might reasonably induce the promisee's action *or inaction*.'") (emphasis added) (quoting *Faimon v. Winona State Univ.*, 540 N.W.2d 879, 882 (Minn. Ct. App. 1995), *review denied* (Minn. Feb. 9, 1996)); *see also* Restatement (Second) of Contracts § 90(1) (Am. L. Inst. 1981). Therefore, the promissory estoppel claim survives.

V

GS Labs asserts an unjust enrichment claim in Count V. The Minnesota Supreme Court has described the elements of an unjust enrichment claim as follows:

> To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay. [U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully.

13

*Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012) (quoting *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996)); *see also Klass v. Twin City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494–95 (Minn. 1971) ("Very broadly defined, the [unjust-enrichment] cause of action was described by Mr. Justice Mitchell in *Brand v. Williams*, 29 Minn. 238, 239, 13 N.W. 42, as one which 'can be maintained whenever one man has received or obtained the possession of the money of another, which he ought in equity and good conscience to pay over.'"); *Cady v. Bush*, 166 N.W.2d 358, 361 (Minn. 1969) ("[T]he theory of unjust enrichment . . . 'is founded on the principle that no one ought unjustly to enrich himself at the expense of another, and the gist of the action is that the defendant has received money which in equity and good conscience should have been paid to the plaintiff, and under such circumstance that he ought, by the ties of natural justice, to pay over.'") (citation omitted).

GS Labs alleges that Blue Cross received value in two ways. First, GS Labs says that it provided diagnostic testing services to Blue Cross members "without prepayment" from Blue Cross and that this lack of prepayment "enabled Blue Cross to use its money for other purposes, which corresponded to avoidance of the cost of capital for those purposes." Am. Countercl. ¶ 337. Second, GS Labs alleges that its services "improved health outcomes, which have dramatically reduced Blue Cross'[s] health care spend and the spending it would have outlaid in the absence of GS Labs' testing." *Id.* ¶ 338. GS Labs alleges that "studies have shown that increased availability of rapid COVID-19 testing, which is facilitated and made readily accessible by providers like GS Labs, dramatically improves patient health outcomes, reduces the spread of the virus, saves lives, and prevents

and (consequently) reduces Blue Cross'[s] spend." *Id.* GS Labs' assertion that Blue Cross's receipt of value was unjust seems derived entirely from its contention that § 3202 of the CARES Act required Blue Cross to pay. *See id.* ¶¶ 343, 348.

These allegations do not plausibly show that Blue Cross received something of value or, if it did, that the receipt was unjust. A vendor's provision of services to an insured ordinarily does not enrich the insured's insurer. The patient—not the insurer—receives the services' benefits. *See Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, No. 4:16-CV-00266 BSM, 2018 WL 2422314, at *9 (E.D. Ark. May 29, 2018) (noting that "a number of courts have found that medical providers cannot bring unjust enrichment claims against insurers because patient-subscribers, and not insurers, are the ones receiving benefits from the provider's services[]" and citing cases), *aff'd*, 931 F.3d 647 (8th Cir. 2019). And for an insurer, claims are expenses, not something of value. *See Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) ("The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money on the insured—which hardly can be called a benefit."). GS Labs' second theory—that COVID testing prevented the contraction and wider spread of more and more serious illness, which in turn saved costs—doesn't show that Blue Cross was enriched in the relevant sense. According to this theory, those higher costs would have been incurred by countless individuals, governmental units, health insurers, and non-health-related businesses—really, just about everyone. In other words, in GS Labs' view, just about everyone benefitted from diagnostic testing for COVID. The problem is that it is difficult to understand how a society-wide benefit may be the "something of value" to support an

unjust-enrichment claim.  The Minnesota Supreme Court's descriptions of the cause of action quoted above seem at least to assume the presence of a more specific benefit, like "the money of another" described in *Brand*, 29 Minn. at 239, 13 N.W. at 42.  And no authority has been cited or identified in our research that might support the idea that something as indeterminate as widespread cost reduction might plausibly support an unjust-enrichment claim.  Enrichment aside, GS Labs does not allege what made the absence of prepayment unjust.  It cannot be § 3202 of the CARES Act.  That would enable GS Labs to turn a private-right-of-actionless statute into a common-law claim, something Minnesota generally forbids.  *See Palmer v. Ill. Farmers Ins. Co.*, 666 F.3d 1081, 1087 (8th Cir. 2012).  Regardless, § 3202 says nothing about the prepayment of insurance benefits.

## VI

Turn next to GS Labs' negligence per se claim in Count VI.  "Negligence per se is a form of ordinary negligence that results from violation of a statute."  *Anderson v. State, Dep't of Nat. Res.*, 693 N.W.2d 181, 189 (Minn. 2005) (quoting *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981)).  "The only difference [between negligence and negligence per se] is that the measure of legal duty for actual negligence is determined upon common-law principles[,] while the measure of duty for negligence per se is fixed by the statute, so that its violation constitutes conclusive evidence of negligence."  *Kronzer v. First Nat'l Bank of Minneapolis*, 235 N.W.2d 187, 192 (Minn. 1975).  Not all statutes or ordinances create a tort duty of care.  "'[T]he negligence per se doctrine . . . is not a magic transforming formula that automatically creates a private right of action for the civil enforcement, in tort

16

law, of every statute.'" *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 592

F. Supp. 2d 1147, 1163 (D. Minn. 2009) (quoting *Talley v. Danek Med., Inc.*, 179 F.3d

154, 158 (4th Cir.1999)).  "In other words, the doctrine simply sets the standard of care

'where an underlying common law cause of action [already] exists.'" *Id.* (quoting *Elder v.*

*Allstate Ins. Co.*, 341 F. Supp. 2d 1095, 1100 (D. Minn. 2004)).  And Minnesota "ha[s]

long followed the criteria set forth by the American Law Institute in Restatement, Torts 2d,

in determining which statutes give rise to a civil duty" such that a violation of the statute

or ordinance will constitute negligence per se.  *Kronzer*, 235 N.W.2d at 193.  Section 286

of the Second Restatement of Torts provides:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286 (Am. L. Inst. 1975).

GS Labs' negligence per se theory is that Blue Cross "has always owed" providers

(including GS Labs) "a duty of care of that of an ordinary prudent insurer acting in similar

circumstances during a public health emergency and viral pandemic."  Am. Countercl. ¶

352.  It alleges that "[t]he CARES Act merely codified this duty owed by an ordinary

prudent insurer into a statutory standard of care, specifically in the current COVID-19 pandemic." *Id.* ¶ 354. And GS Labs alleges that "[t]he CARES Act's standard of care establishes that an ordinary prudent insurer in these circumstances would fully reimburse a provider at the publicly-posted cash rate for diagnostic testing in the event there is no separately-negotiated rate." *Id.* ¶ 355.

These allegations do not plausibly show negligence per se. This is so for purely legal reasons. No authority has been identified supporting the conclusion that a health insurer "has always owed" a tort-law-created duty of care in connection with its commercial claim reimbursement activities. GS Labs cites no case creating or identifying this duty, whether during a public-health emergency or not. The case on which it chiefly relies, *Osborne v. McMasters*, concerned a personal injury claim against a drugstore owner whose employee "sold to plaintiff's intestate a deadly poison without labeling it 'Poison,' as required by statute." 41 N.W. 543 (Minn. 1889). We don't have anything like that here. Regardless, if § 3202 may be described as addressing reimbursement for COVID diagnostic testing, it cannot possibly be described as addressing tort-like or extra-reimbursement harm a provider might incur if it is not reimbursed. In other words, the statute does not protect the particular interest or against the kind of harm that GS Labs seeks to vindicate through its negligence per se claim.

VII

GS Labs asserts a claim for tortious interference with prospective business relations in Count VII. For this claim to survive a Rule 12(b)(6) motion, GS Labs must allege facts plausibly showing five elements:

> (1) The existence of a reasonable expectation of economic advantage; (2) Defendant's knowledge of that expectation of economic advantage; (3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and (5) That plaintiff sustained damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). To show that an expectation of economic advantage is "reasonable," a plaintiff must "specifically identify a third party with whom the plaintiff had a reasonable probability of a future economic relationship." *Id.* at 221; *see also CH Bus Sales, Inc. v. Geiger*, No. 18-cv-2444 (SRN/KMM), 2019 WL 1282110, at *12 (D. Minn. Mar. 20, 2019) (dismissing a tortious-interference claim because the plaintiff did not "identify any specific customers or business relations it has lost, or may lose, due to [the defendants'] conduct").

In support of this claim, GS Labs alleges that it "had a valid and reasonable business expectancy and relationship with the ASO plans administered by Blue Cross." Am. Countercl. ¶ 363. GS Labs alleges, albeit "[o]n information and belief," that "Blue Cross intentionally interfered with the ASO plans' reimbursement of claims" GS Labs submitted when it "caused the ASO plans to refuse to reimburse" these claims. *Id.* ¶¶ 367–68; *see also id.* ¶ 370. To support the element that the alleged interference be "independently tortious or in violation of a state or federal statute or regulation," *Gieseke*, 844 N.W.2d at

219, GS Labs alleges only that "Blue Cross'[s] interference violated the CARES Act (or, alternatively, state law), as set forth herein." *Id.* ¶ 369.

These allegations are not sufficient. GS Labs' reliance on the CARES Act presents a problem with respect to the requirement that "the intentional interference [be] either independently tortious or in violation of a state or federal statute or regulation." *Id.* I've concluded that § 3202 of that Act creates no private right of action, and in Minnesota, "the law is settled that a litigant cannot directly . . . use an alleged violation of [a] statute [lacking a private right of action] to prove elements of a common law claim." *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 905 (Minn. Ct. App. 2005). GS Labs does not identify the alternative state law to support this element. Therefore, GS Labs has not plausibly alleged facts showing that Blue Cross's alleged interference was tortious in the relevant sense.

## VIII

GS Labs asserts a second breach-of-contract theory in Count VIII, this one based on an assignment of contract rights. It alleges that Blue Cross "issue or facilitates" non-ERISA health insurance plans. Am. Countercl. ¶ 375.[2] GS Labs alleges that, when individuals who are insured under these plans receive COVID diagnostic testing from GS Labs, "they assign to GS Labs any rights they have under their plans of insurance issued or facilitated by Blue Cross." *Id.* ¶ 378. This assignment "entitles GS Labs to pursue [the

---

[2]   ERISA does not apply to some employee benefit plans, including plans sponsored by certain organizations (*e.g.*, governmental plans). 29 U.S.C. § 1003(b). Such plans ordinarily are governed by state law. *See, e.g.*, *Hampton v. Standard Ins. Co.*, 815 Fed. App'x 100 (8th Cir. 2020) (Mem.).

insured's] contractual claims against Blue Cross." *Id.* ¶ 379.  Central to this claim, GS Labs alleges: "These plans of insurance provide that Blue Cross will provide coverage for the full publicly-posted cash price of COVID-19 diagnostic testing because all plans of insurance were amended, by operation of law pursuant to FFCRA § 6001 and CARES Act §§ 3201–3202, to provide coverage for COVID-19 diagnostic testing." *Id.* ¶ 377.

At least as pleaded, this claim doesn't get past legal problems.  Section 6001 of the FFCRA and §§ 3201 and 3202 of the CARES Act do not say their COVID-testing-coverage requirements "amend" or are incorporated by reference in non-ERISA health insurance policies or plans.  The coverage requirement appears in § 6001(a) of the FFCRA, but § 6001(b) says that "subsection (a) shall be applied by the" Secretaries of Health and Human Services, Labor, and of the Treasury "as if [§6001(a) were] included" in federal statutes under the auspices of each agency.  Pub. L. No. 116-127, §§ 6001(a), (b), 134 Stat. 178, 201–202 (2020).  The statute says nothing about health insurance policies governed by state law.  And Minnesota law ordinarily forbids incorporating a statutory duty into an insurance policy when the statute creates no private right of action.  *Nelson v. Am. Family Mut. Ins. Co.*, 899 F.3d 475, 480 (8th Cir. 2018) (citing *Palmer*, 666 F.3d at 1086; *Burgmeier v. Farm Credit Bank of St. Paul*, 499 N.W.2d 43, 47 (Minn. Ct. App. 1993)).

I'll grant that the implausibility of this claim may seem somewhat unusual to any person familiar with the health-insurance claims process.  Insured patients, their providers, and their insurers ordinarily interact just as GS Labs alleges: the insured patient signs an assignment-of-benefits form that gives the provider the right to bill the insurer for benefits due under the patient's policy.  If the insurer refuses to pay, the provider (often) sues the

insurer for the benefits.  Depending on the nature of the plan, that suit will be governed by state law or ERISA.  To be clear, GS Labs' assignment-based contract claim here is different.  The claim relies—not on the terms in each of its patient's insurance contracts or plans—but on a theory that a contract term essential to GS Labs' claim has been incorporated into each patient's insurance contract.  I think this theory is legally flawed (and therefore implausible) because (1) the federal statutes that are the claim's source do not include incorporation language—that is, they do not say that the requirement to cover COVID-19 diagnostic testing is incorporated into contracts governed by state law, and (2) I've already determined that the relevant FFCRA and CARES Act provisions contain no private right of action, and Minnesota law doesn't permit an incorporation theory to end-run this problem.

## IX

In Count IX, GS Labs asserts a claim under ERISA's civil enforcement provision, 29 U.S.C. § 1132.  Specifically, it asserts a claim under § 1132(a)(1), which authorizes "a participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  And it asserts a claim under § 1132(a)(3), which authorizes "a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

22

GS Labs' ERISA theories essentially track its assignment-based breach-of-contract claim. It alleges that "Blue Cross issues or facilitates" ERISA-governed health insurance plans. Am. Countercl. ¶ 384. It alleges that, when individuals who are insured under these plans receive COVID diagnostic testing from GS Labs, "they assign to GS Labs any rights they have under their plans of insurance issued or facilitated by Blue Cross." *Id.* ¶ 387. This assignment "entitles GS Labs to pursue [the insured's] statutory claims, such as those under ERISA § 502, against Blue Cross." *Id.* ¶ 388. Again, central to this claim, GS Labs alleges: "These plans of insurance provide that Blue Cross will provide coverage for the full publicly-posted cash price of COVID-19 diagnostic testing because all plans of insurance were amended, by operation of law pursuant to FFCRA § 6001 and CARES Act §§ 3201–3202, to provide coverage for COVID-19 diagnostic testing." *Id.* ¶ 386. GS Labs seeks "benefits due" under § 1132(a)(1)(B), and to "to enjoin Blue Cross'[s] act and practice of failing to fully reimburse for COVID-19 diagnostic testing" under § 1132(a)(3). *Id.* ¶¶ 390–91.

The starting point is determining whether the law might permit a provider like GS Labs to assert these claims. The primary issue is whether § 3202(a)'s requirement that, absent a negotiated rate, Blue Cross "shall reimburse" GS Labs at its website-listed cash price is enforceable under ERISA's civil enforcement provision. Based on a review of the relevant, intertwined statutes, I conclude it is. But this conclusion is neither obvious nor inarguable.

Begin with § 6001(a) of the FFCRA. It requires group health plans and health insurance issuers to provide coverage for COVID-19 diagnostic testing without imposing

"any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization or other medical management requirements." Pub. L. No. 116-127, § 6001(a), 134 Stat. 178, 201–202 (2020). Section 6001(a), in other words, imposes a coverage requirement; it says Blue Cross had to cover COVID-19 diagnostic services without cost-sharing by plan participants. Section 6001(b) of the FFCRA says, in turn, that this coverage-without-cost-sharing requirement "shall be applied" by the responsible agency heads "as if included" in various federal laws, including by the Secretary of Labor as if included in "part 7" of ERISA. *Id.* § 6001(b). If § 6001(a)'s coverage requirement is deemed included in part 7 of ERISA as § 6001(b) seems to direct, then there is no question a plan or insurer's failure to comply with this coverage-without-cost-sharing requirement is subject to challenge under ERISA's civil enforcement provision. Section 1132(a)(3) allows "a participant, beneficiary, or fiduciary" to bring a civil action "to enjoin" or "to obtain other appropriate equitable relief" with respect to violations "of "this subchapter." 29 U.S.C. § 1132(a)(3). ERISA's civil enforcement provision appears in part 5 of subchapter I; part 7 and its requirements for group health plans also appears in subchapter I. *See* 29 U.S.C.A. §§ 1161–1500 (vol.) at 3–5 (table of contents).

GS Labs' ERISA claims in Count IX go beyond seeking just coverage for its services; it also seeks payment at the cash price it listed on its website. GS Labs seeks enforcement of the "shall reimburse" requirement in § 3202(a) of the CARES Act: "If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website." Pub. L. No. 116-136, § 3202(a)(1),

134 Stat. 281, 367 (2020).  For essentially two reasons, I conclude that § 3202(a)'s cash-price reimbursement requirement may be enforced through ERISA's civil enforcement provision.  The first is textual.  I understand § 3202(a)'s cross-reference to § 6001(a) of the FFCRA to incorporate that statute's directive that its provisions be applied "as if included" in part 7 of ERISA.  As explained in the preceding paragraph, the inclusion of § 3202(a)'s reimbursement requirement in part 7 of ERISA means the requirement could be the subject of an action under 29 U.S.C. § 1132(a).  The second reason is practical.  It is difficult to understand how § 6001(a)'s requirement that coverage be provided without "any cost sharing . . . requirements" could be enforced by a plan participant without considering, and likely litigating, the price a health plan or health insurance issuer pays for the diagnostic testing.[3]  It helps that these conclusions are consistent with the result reached by the only other court to have considered this particular issue, though that court approached the question somewhat differently.  *See Open MRI and Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health and Life Ins. Co.*, Civ. No. 20-10345 (KM) (ESK), 2022 WL 1567797, at *3–6 (D.N.J. May 18, 2022).

---

[3]      Consider a hypothetical: Patient A participates in a Blue Cross-insured ERISA plan. Patient A experiences typical COVID symptoms and decides to get tested.  Patient A goes to a GS Labs facility for the test.  Rather than assign her benefits to GS Labs, Patient A pays cash and then submits the receipt to Blue Cross for coverage.  Blue Cross pays Patient A only a portion of what Patient A paid GS Labs, claiming that GS Labs' charge did not equal the cash price for such service as listed by GS Labs on a public internet website.  In that situation, whether Blue Cross imposed a cost-sharing requirement would seem inextricably intertwined with the reimbursement/cash-price question.

25

Having determined that the law might permit a provider like GS Labs to assert these claims, the next question is whether GS Labs has alleged facts plausibly showing its entitlement to the relief it seeks.  Recall that GS Labs alleges that, when it provides testing services to ERISA plan participants insured by Blue Cross, the participants "assign to GS Labs any rights they have under their plans of insurance issued or facilitated by Blue Cross, including any rights these patients have under ERISA."  Am. Countercl. ¶ 387.  Blue Cross argues that, even if legally permissible, GS Labs' ERISA claims in Count IX are factually implausible for three reasons.

First, Blue Cross argues that its plans uniformly include anti-assignment provisions that render GS Labs' alleged assignments ineffective, and Blue Cross has filed with its motion one page from one of its plans that includes "anti-assignment language that is standard across [Blue Cross's] fully insured plans."  ECF No. 38 ¶ 5; ECF No. 38-4.  This argument is not persuasive in this procedural context.  Though no case has been cited addressing this specific question, whether, and the extent to which, anti-assignment provisions might render GS Labs' alleged assignments ineffective seems like an affirmative defense that Blue Cross bears the burden to plead and prove.  Defense, Black's Law Dictionary (11th ed. 2019).  For an affirmative defense to justify a Rule 12(b)(6) dismissal of a complaint, "the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion."  5B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 1357 (3d ed. & Apr. 2022 Update) (footnotes omitted).  GS Labs' Amended Counterclaim does not include allegations establishing either the presence of anti-

assignment provisions in the at-issue plans and policies or a showing that those anti-assignment provisions bar its claims under ERISA's civil enforcement provision.[4]

Second, Blue Cross argues that GS Labs failed to exhaust its administrative remedies before bringing suit. An ERISA plaintiff must exhaust available administrative remedies. *Angevine v. Anheuser-Busch Cos. Pension Plan*, 646 F.3d 1034, 1037 (8th Cir. 2011). The exhaustion requirement is excused "only when pursuing an administrative remedy would be futile or there is no administrative remedy to pursue." *Id.* The exhaustion requirement is not an affirmative defense. As the Eighth Circuit has explained: "Our case law is clear that [an ERISA plaintiff's] claim can proceed only if he has pled sufficient facts to show either futility or lack of administrative remedy." *Id.* at 1038; *see also J.P. v. BCBSM, Inc.*, No. 18-cv-3472 (MJD/DTS), 2020 WL 7626655, at *3 (D. Minn. Feb. 24, 2020) (recognizing in an ERISA benefits claim that "although Plaintiffs bear no burden of production on a motion to dismiss, this Court must still consider whether the Amended Complaint—and any documents embraced by it—shows either exhaustion or an exception

---

[4]     To support its anti-assignment argument, Blue Cross filed "a true and correct excerpt of a [Blue Cross] fully insured plan . . . setting forth anti-assignment language that is standard across [Blue Cross's] fully insured plans." ECF No. 38 ¶ 5; ECF No. 38-4. In a more typical ERISA benefits dispute, it would be appropriate to consider the entire at-issue plan's terms, including any anti-assignment provision, because such terms ordinarily are embraced by the pleadings. *See, e.g.*, *Karg v. Transamerica Corp.*, No. 18-CV-134-CJW-KEM, 2019 WL 3938471, at *1 n.1 (N.D. Iowa Aug. 20, 2019) ("An ERISA plan document is necessarily embraced by the pleadings when the complaint specifically mentions the plan under which a plaintiff's ERISA claims arose."). This isn't that kind of case. GS Labs does not identify the at-issue plans in its Amended Counterclaim, and its allegations imply there are *many* at-issue plans. And accepting Blue Cross's argument requires, in turn, accepting its factual assertion that the exemplary anti-assignment provision it filed (or an equivalent term) is in every at-issue plan. Going that route would not be faithful to Rule 12(b)(6).

thereto"), *report and recommendation adopted*, 2020 WL 1442683 (D. Minn. Mar. 24, 2020). "The futility exception is narrow—the plan participant must show that it is certain that her claim will be denied on appeal, not merely that she doubts that an appeal will result in a different decision." *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1085 (8th Cir. 2009) (cleaned up). GS Labs plausibly alleges exhaustion would be futile. Specifically, it alleges that Blue Cross's pre-litigation position, "its refusals to reimburse GS Labs in response to GS Labs' repeated requests for reimbursement, and its pleadings and claims in this action," show that "it is certain that Blue Cross would refuse to fully reimburse GS Labs if GS Labs pursued the administrative remedies set out in the plans." Am. Countercl. ¶ 70. This allegation may be short and plain, *see* Fed. R. Civ. P. 8(a)(2), but is neither speculative nor conclusory. It relies on Blue Cross's well-documented view of GS Labs' services and Blue Cross's allegations and claims in this case to show that, if GS Labs had filed administrative claims, they would certainly have been denied. That inference is plausible.

Third, Blue Cross argues that GS Labs lacks statutory standing to assert a claim for equitable relief under 29 U.S.C. § 1132(a)(3). The gist of Blue Cross's position is that the assignments GS Labs alleges it received from individuals who participated in plans insured or administered by Blue Cross gave GS Labs at most the right to sue for benefits. "[T]o have the right to seek equitable relief under ERISA, a party must either be a participant, beneficiary, or fiduciary, or the assignee of a participant, beneficiary, or fiduciary." *Air Evac EMS, Inc. v. USAble Mut. Ins. Co.*, 931 F.3d 647, 650 (8th Cir. 2019). In *Air Evac EMS*, the Eighth Circuit determined that an assignment obtained by the provider (Air Evac

28

EMS) did not include ERISA claims for equitable relief, and the court's analysis of the issue is worth repeating here:

> More important than general statements as to liberal or narrow constructions, however, is the fact that our job is to interpret the express language of the assignment in the context in which it was made. When Arkansas Blue plan members assigned their rights to Air Evac, they did so in the context of facilitating payment for Air Evac's past provision of services. Thus, when Arkansas Blue plan members assigned "all rights to (and related or associated with) any benefit claims" to Air Evac, its [sic] seems clear, at a minimum, that they assigned Air Evac the right to recover benefits under § 1132(a)(1)(B). Given the context of the assignment, however, it does not automatically follow that such language also conveyed the right to sue for reformation of plan terms and other equitable relief under § 1132(a)(3). Indeed, the assignment does not specifically mention the right to sue for equitable relief; rather it limits the rights conveyed to those "related or associated with . . . *benefit claims* and/or *payments* due from any third-party payor." (Emphasis added). Moreover, the rights that are specifically mentioned—"the rights to pursue *administrative claims*, request documents, *receive payment* and pursue litigation in order to *obtain payment*" (emphasis added)—all suggest that Air Evac sought assignment of ERISA rights related to obtaining payment, not equitable relief. Accordingly, we conclude that Air Evac's assignment does not convey the right to sue for equitable relief under § 1132(a)(3).

*Id.* at 651. The assignments GS Labs alleges it obtained do not mention the right to sue for equitable relief and seem a lot narrower than the assignment at issue in *Air Evac EMS*. GS Labs alleges: "Patients in Minnesota assign their rights under their respective plans of insurance (including those issued by Blue Cross) to GS Labs by agreeing to the following terms in scheduling an appointment with GS Labs: 'I assign to GS Labs all rights and claims *for the medical benefits* to which I am entitled for the services provided.'" Am.

Countercl. ¶ 67 (emphasis added).  Under *Air Evac EMS*, this assignment does not convey

to GS Labs the right to sue for equitable relief under § 1132(a)(3).

X

GS Labs asserts a false-advertising claim under the Lanham Act, 15 U.S.C. §

1125(a).  Under the Lanham Act:

> Any person who, . . . in connection with any goods or services,
> . . . uses in commerce any . . . false or misleading description
> of fact, or false or misleading representation of fact, which . . .
> in commercial advertising or promotion, misrepresents the
> nature, characteristics, [or] qualities . . . of his or her . . . goods,
> services, or commercial activities . . . shall be liable in a civil
> action by any person who believes that he or she is likely to be
> damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  The Act's purpose is "to protect persons engaged in commerce

against false advertising and unfair competition." *Am. Italian Pasta Co. v. New World*

*Pasta Co.*, 371 F.3d 387, 390 (8th Cir. 2004) (quoting *United Indus. Corp. v. Clorox Co.*,

140 F.3d 1175, 1179 (8th Cir. 1998)).

The Eighth Circuit has distilled this statutory text into five elements that a plaintiff

must prove to establish a false-advertising claim:

> (1) a false statement of fact by the defendant in a commercial
> advertisement about its own or another's product; (2) the
> statement actually deceived or has the tendency to deceive a
> substantial segment of its audience; (3) the deception is
> material, in that it is likely to influence the purchasing decision;
> (4) the defendant caused its false statement to enter interstate
> commerce; and (5) the plaintiff has been or is likely to be
> injured as a result of the false statement, either by direct
> diversion of sales from itself to defendant or by a loss of
> goodwill associated with its products.

*United Indus. Corp.*, 140 F.3d at 1180. A plaintiff's failure to demonstrate any one of the five elements is fatal to its claim. *Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005).

GS Labs alleges that Blue Cross made essentially five false or misleading statements. *First*, it alleges that "Blue Cross falsely stated that only 'medically necessary' and 'appropriate' COVID-19 diagnostic testing is covered by insurance." Am. Countercl. ¶ 94. *Second*, GS Labs alleges that "Blue Cross has falsely stated or implied that there may be coverage differences with respect to COVID-19 diagnostic testing provided by 'in-network' or 'participating' providers versus 'out-of-network' or 'non-participating' providers." *Id.* ¶ 97. *Third*, GS Labs alleges that "Blue Cross has falsely stated that patients may have to share the cost of COVID-19 diagnostic testing, in proximity to statements about medical necessity." *Id.* ¶ 100. *Fourth*, it alleges that "Blue Cross has falsely implied that it may impose prior authorization requirements on coverage for COVID-19 diagnostic testing." *Id.* ¶ 103. *Fifth*, GS Labs alleges that "Blue Cross omitted information [from] its public statements that created the false impression that COVID-19 diagnostic testing provided by out-of-network or non-participating providers is not covered." *Id.* ¶ 106.

GS Labs says that statements falling in each of these categories are false for essentially the same reason: they contradict § 6001(a) of the FFCRA and §§ 3201 and 3202 of the CARES Act to the extent those statutes require a health insurance issuer to cover COVID-19 diagnostic testing without cost-sharing or prior authorization or other medical management requirements and regardless of whether the provider is out-of-network. *See id.* ¶¶ 96, 102, 105, 108. GS Labs alleges that consumers have relied on these statements

and "have either avoided testing altogether or chosen to obtain testing from certain providers over others, such as those that are 'in-network' or 'participating,'[] to the exclusion of GS Labs." *Id.* ¶ 109.  The resulting consumer decisions, GS Labs alleges, "have harmed patient choice, risked the public health, and resulted in reduced diagnostic testing at GS Labs." *Id.* ¶ 110.

The parties' first disagreement concerns whether the Amended Counterclaim's false-advertising allegations comply with Federal Rule of Civil Procedure 9(b).  Blue Cross says it does not.  GS Labs says it does.  Assuming Rule 9(b) applies, I conclude the Amended Counterclaim satisfies it.[5]  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."  *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006); *see Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015) (same).  "The claim must identify who, what, where, when, and how."  *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

---

[5]     "Courts are divided on the issue of whether Rule 9(b) applies to Lanham Act claims that are grounded in fraud."  *N. Bottling Co., Inc. v. Henry's Foods, Inc.*, 474 F. Supp. 3d 1016, 1028 (D.N.D. 2020) (citing  *Nestle Purina PetCare Co. v. Blue Buffalo Co.*, No. 4:14 CV 859 RWS, 2015 WL 1782661, at *8 (E.D. Mo. Apr. 20, 2015)); *see also Wing Enters., Inc. v. Tricam Indus., Inc.*, No. 20-cv-2497 (SRN/ECW), 2021 WL 3620272, at *13 (D. Minn. Aug. 16, 2021) (citing numerous District of Minnesota cases applying Rule 9(b) to Lanham Act and state-law false-advertising claims).

While Rule 9(b) requires particularity in pleading, "a complaint need not be filled with precise detail." *Moua v. Jani-King of Minn., Inc.*, 613 F. Supp. 2d 1103, 1110 (D. Minn. 2009). Rather, "Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Costner*, 317 F.3d at 888. "The level of particularity required depends on the nature of a case," *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012), and to determine whether a party has satisfied Rule 9(b), courts look to "the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading," *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957) (citation omitted).

The Amended Counterclaim's Lanham Act allegations meet Rule 9(b)'s particularity requirement. These allegations quote numerous statements allegedly made by Blue Cross, easily satisfying the "who" and "what" elements. The Amended Counterclaim is less specific about when, where, and how Blue Cross allegedly made these statements. As to when, the pleading provides a series of "no later than" dates. For example, it alleges that "some" statements falling in the first category were made "no later than March 2020." Am. Countercl. ¶ 95. As to where and how, the pleading provides only examples: "written materials such as [Blue Cross's] website, circulars, and brochures." *Id.* ¶ 92. The gaps these allegations leave might be a problem in another case. Here, they seem easily fillable considering that the statements on which the claim relies are quoted at length. As a

practical matter, that should make it feasible for Blue Cross to undertake a relatively straightforward, non-burdensome search and fill these gaps.  In other words, in the unique circumstances of this case, the Amended Counterclaim's Lanham Act allegations give Blue Cross the notice Rule 9(b) requires.

Blue Cross next challenges whether the statements GS Labs identifies to support its Lanham Act claim are "in a commercial advertisement."  *United Indus. Corp.*, 140 F.3d at 1180.   The widely applied test for determining whether a statement is commercial advertising under the Lanham Act is as follows:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994).[6]  Other judges in this District have applied the *Gordon & Breach* test, or at least parts of it, often.  *See, e.g.*, *Am. Achievement Corp. v. Jostens, Inc.*, --- F. Supp. 3d ---, No. 21-cv-2613 (NEB/BRT), 2022 WL 3566862, at *13 (D. Minn. Aug. 18, 2022); *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 988 F. Supp. 2d 1047, 1052–53 (D. Minn.

---

[6]   In *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, the Second Circuit adopted the first, third, and fourth elements of the *Gordon & Breach* test.  314 F.3d 48, 58 (2d Cir. 2002).  It did not address the second element, but "note[d] that the requirement [that defendant and plaintiff be competitors] is not set forth in the text of Section 43(a)." *Id.*

2013); *Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*, 328 F. Supp. 2d 980, 1018 (D. Minn. 2004); *Aviation Charter, Inc. v. Aviation Rsch. Grp./US*, No. 03-cv-2439 (PAM/RLE), 2004 WL 1638176, at *5 (D. Minn. July 10, 2004), *aff'd sub nom. Aviation Charter, Inc. v. Aviation Rsch. Grp./US*, 416 F.3d 864 (8th Cir. 2005); *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069–70 (D. Minn. 1999); and *Med. Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 650 (D. Minn. 1994). Though the Eighth Circuit has neither formally adopted nor explicitly applied the *Gordon & Breach* test in full, it applied the test's fourth element in *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999), citing as support a Fifth Circuit case, *Seven–Up Co. v. Coca–Cola Co.*, that applied all four of the test's factors and declared the test "to be both accurate and sound." 86 F.3d 1379, 1384 (5th Cir.1996). The bottom line is that it makes good sense to apply the *Gordon & Breach* test here.

The Amended Counterclaim lacks allegations plausibly meeting this test—or, in other words, showing that the at-issue statements were in a commercial advertisement. No allegations address whether Blue Cross is in competition with GS Labs. It would seem strange to say they are. Blue Cross, as the Amended Counterclaim describes it, is a health insurer and administrator of self-funded health insurance plans. No allegation suggests that GS Labs competes in that market. GS Labs is a clinical lab. No allegation suggests that Blue Cross competes in that market. The Amended Counterclaim also includes no allegation suggesting that the many Blue Cross statements it quotes were made for the purpose of influencing customers to purchase Blue Cross's insurance products or services. The absence of such allegations is a problem by itself, but there is more. A careful review

of the statements and GS Labs' related allegations permits at most the plausible inference that the statements were intended to inform Blue Cross customers and providers of the extent of existing COVID-19 diagnostic testing coverage under health insurance policies and plans issued or administered by Blue Cross. Consider, for example, GS Labs' allegation that "consumers and referring physicians rely upon Blue Cross as a source for truthful information about healthcare coverage under both Blue Cross plans of insurance and the law generally." Am. Countercl. ¶ 93. This allegation plausibly describes how the at-issue statements served informational purposes; it does not plausibly allege that the statements were made for the purpose of influencing consumers to buy Blue Cross's insurance or services. Finally, the Amended Counterclaim includes no allegations plausibly showing whether the statements, or any of them, were disseminated sufficiently to the relevant purchasing public. It is true that some statements—like those alleged to have been available via Blue Cross's website—may have been widely available. But without knowing more, that inference cannot plausibly be made with respect to many of the other at-issue statements. Regardless, GS Labs alleges no facts concerning the identity or scope of the relevant purchasing public. Because the Amended Counterclaim's allegations do not plausibly show that the identified statements were in a commercial advertisement, GS Labs' Lanham Act claim must be dismissed.

XI

In Count XI, GS Labs asserts a claim under the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44. It is settled that the Deceptive Trade Practices Act "mirrors" the Lanham Act, and courts therefore "use the same analysis to evaluate false

36

advertising claims that are made simultaneously under the federal and state statutes." *Med. Graphics*, 872 F. Supp. at 649; *accord Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 809 n.7 (D. Minn. 2011); *see Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1183 (8th Cir. 2011) (recognizing that "[w]hen a commercial plaintiff asserted pendent state law claims under these Minnesota statutes in a Lanham Act" case, the state claims "are coextensive with the federal claims." (quotation omitted)).  There is no question here that GS Labs' Lanham Act and Deceptive Trade Practices Act claims are identical— or, "simultaneous" to borrow from *Med. Graphics Corp.*  GS Labs does not quarrel with the idea that, as its Lanham Act claim goes, so goes its claim under the Deceptive Trade Practices Act.  This claim will therefore be dismissed.

XII

In Count XII, GS Labs asserts the same false advertising allegations that supported its Lanham Act claim to advance a claim under the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subdiv. 1.  *See* Am. Countercl. ¶¶ 409–413.  As with Count XI, Blue Cross says this claim shares the analysis—and falls—with GS Labs' Lanham Act claim.  *See Buetow*, 650 F.3d at 1183; *Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc.*, 822 F. Supp. 1437, 1441 (D. Minn. 1993).  And as with Count XI, GS Labs does not dispute the point.  Count XII will therefore also be dismissed based on the analysis of Count X.

XIII

GS Labs asserts a series of antitrust claims, beginning with Count XIII.  In this Count, it alleges a *per se* violation of § 1 of the Sherman Act.  Am. Countercl. at 167 (Count

37

XIII heading).  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade."  15 U.S.C. § 1. "*Twombly*, which also involved a claim under § 1 of the Sherman Act, makes clear that a conclusory allegation of conspiracy does not suffice." *Uhr v. Responsible Hospitality Inst., Inc.*, No. 10-cv-4945 (PJS/TNL), 2011 WL 4091866, at *7 (D. Minn. Sept. 14, 2011). "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  "[I]ndependent allegation[s] of actual agreement"—in other words, allegations of direct evidence of an agreement—suffice provided they are factually plausible and not "merely legal conclusions." *Id.* at 564.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id*. at 556.  "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.  In particular, a § 1 plaintiff who relies on allegations of parallel conduct must allege that "certain 'plus factors' exist." *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc).  Examples of plus factors "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Alaska Dep't of Revenue, Treasury Div. v. Manku*, No. 20-1759-cv, 2021 WL 3027170, at *3 (2d Cir. July 19, 2021) (citation and quotations omitted).  Conspiracy allegations are implausible when there exists an "obvious alternative explanation" for the defendant's conduct that the

complaint does not plausibly undermine. *Twombly*, 550 U.S. at 567; *see also McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015). Conspiracy allegations also do not pass Rule 12(b)(6) when they suggest competition at least as plausibly as a conspiracy. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).

Begin with a summary of GS Labs' § 1 theory: GS Labs alleges that Blue Cross conspired with other, unnamed BCBS affiliates to "carry[] out a buyer's cartel to boycott GS Labs, depress reimbursement rates, and compromise its viability as a competitor[,]" presumably vis-à-vis other clinical labs. Am. Countercl. ¶ 116. GS Labs alleges that Blue Cross's concerted activity "artificially depress[es] prices to non-competitive levels in a commercial insurance market for lab-based COVID-19 testing services and causing shortages in the COVID-19 diagnostic testing market." *Id.* ¶ 118. GS Labs alleges that Blue Cross "has a strong incentive to coordinate with other [unnamed] dominant affiliated BCBS insurers in their rate negotiations and buying strategies for COVID-19 diagnostic testing services, and to do so in a manner that depresses output and eliminates competition." *Id.* ¶ 173. It alleges that Blue Cross has opportunities to conspire with other BCBS affiliates through a national trade association, American Health Insurance Plans (or "AHIP"), and through existing commercial relationships with other BCBS affiliates. *See id.* ¶¶ 172–198. In particular, it alleges that AHIP's publication of articles showing price gouging among COVID-19 diagnostic testing businesses "was a call to arms for commercial insurers: a signal to collectively go on the offensive against COVID-19 diagnostic testing providers such as GS Labs in their negotiations over rates and other business dealings." *Id.* ¶ 196. GS Labs alleges five "plus factors" to support its allegations

of parallel conduct: (1) "Blue Cross and its BCBS affiliates all boycotted GS Labs by refusing to pay it around the same time, consistent with AHIP's signal." *Id.* ¶ 199. (2) "Blue Cross and BCBS affiliates adopted the very same language and positions as one another in their dealings with GS Labs, accusing it of 'price gouging' and proposing payment at levels below GS Labs' operating costs." *Id.* ¶ 200. (3) "Blue Cross and numerous BCBS affiliates all offered identical pretexts for their refusal to pay, at similar times, following similarly timed and virtually identical requests for irrelevant medical documentation." *Id.* ¶ 201. (4) "Blue Cross and numerous BCBS affiliates issued similar false, public, and derogatory statements about GS Labs, including that patients will be liable for higher out-of-pocket costs for seeking care from GS Labs rather than other COVID-19 testing providers." *Id.* ¶ 202. As support for this allegation, GS Labs compares a statement Blue Cross made in connection with the filing of this case with a statement made by a separate BCBS affiliate in connection with a similar lawsuit filed against GS Labs in another court in July 2021. *Id.* ¶ 202 n.69. (5) "[F]rom as early as December of 2020 and continuing into 2021, certain BCBS affiliates submitted complaints to, or were in close contact with, government regulators and enforcers concerning the affiliates' allegations of 'price gouging' and 'medically unnecessary' testing by GS Labs." *Id.* ¶ 203.

These allegations do not plausibly show a § 1 conspiracy that unreasonably restrained trade. GS Labs doesn't identify with whom Blue Cross conspired. It alleges generally that Blue Cross acted in parallel with "other BCBS affiliates"—a phrase appearing throughout the Amended Counterclaim—but this allegation identifies no particular organization or organizations. GS Labs cites cases it says hold that it is not

necessary for a § 1 plaintiff to identify *all* conspirators. Mem. in Opp'n [ECF No. 47] at 49 n.11. The problem here isn't that GS Labs has failed to identify *all* of Blue Cross's alleged co-conspirators. It hasn't identified *any*. It has at most alleged a group that includes potentially dozens of co-conspirators without identifying any one of them as a co-conspirator. In this claim's context, that's the functional equivalent of identifying none. *See Twombly*, 550 U.S. at 565 n.10 (confirming that a § 1 complaint alleging "no specific time, place, or person involved in the alleged conspiracies" does not give the notice Rule 8 requires); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 540, 545–46 (8th Cir. 2015) (affirming dismissal of § 1 claim in part because plaintiff failed to "identify which of the distributors named as defendants—if any—are among the 'key Distributors' who were party to the agreements").

The Amended Counterclaim identifies an obvious alternative explanation for Blue Cross's conduct but does not address it in the relevant sense. According to the pleading, beginning at least in November 2020, concerns regarding COVID-19 testing price gouging were widespread, Am. Countercl. ¶ 191, and in July 2021, Blue Cross and Blue Shield of Kansas City sued GS Labs, *id.* ¶ 209, accusing GS Labs of "intentionally engaging in an abusive scheme to exploit the COVID-19 pandemic by duping health insurers into paying thousands of COVID-19 diagnostic testing claims at grossly inflated rates," *Blue Cross and Blue Shield of Kansas City v. GS Labs LLC*, No. 4:21-cv-525-FJG (W.D. Mo.) (Compl., ECF No. 1). Based on these public allegations, the obvious alternative explanation for Blue Cross's conduct is that it suspected, and later concluded (as this lawsuit shows), that GS Labs was charging unreasonably excessive prices for its tests. GS

Labs' allegations do not plausibly show that Blue Cross's parallel conduct more likely resulted from a § 1 "contract, combination, or conspiracy" as from these obvious and ordinarily reasonable business concerns.

And GS Labs' collusion theory is economically irrational and therefore implausible. The majority of GS Labs' allegations concern only GS Labs; it identifies no other clinical lab that suffered injury resulting from the alleged conspiracy. But in places, GS Labs goes further and alleges broader market consequences to support its § 1 claim. These include, for example, allegations that Blue Cross's concerted activity "artificially depress[es] prices to non-competitive levels in a commercial insurance market for lab-based COVID-19 testing services[,] and caus[es] shortages in the COVID-19 diagnostic testing market." Am. Countercl. ¶ 118. This allegation seems economically irrational and therefore implausible.[7] Blue Cross should have an interest in the market presence of more clinical labs, not fewer. More clinical labs would create more competition, resulting in greater price pressure on clinical lab participants, and yielding lower prices to retail customers and their insurers. And leaving the allegation's indefiniteness aside, GS Labs alleges elsewhere that the diagnostic testing services GS Labs and other clinical labs provide "improved health outcomes, which have dramatically reduced Blue Cross'[s] health care spend and the spending it would have outlaid in the absence of GS Labs' testing." Am. Countercl.

---

[7]      If not relied on very often, economic irrationality is a recognized ground to find a complaint's allegations implausible. *See, e.g.*, *Green Star Energy Sols., LLC v. Edison Props., LLC*, No. 21-cv-2682 (LJL), 2022 WL 16540835, at *8 (S.D.N.Y. Oct. 28, 2022) (finding economically irrational allegations to be implausible under Rule 12(b)(6) standard).

¶ 338.  In GS Labs' theory, the absence of Blue Cross's prohibited § 1 conduct would enable more clinical labs to participate in the market, eliminate testing shortages, and enable those labs to *increase* their prices.  As Blue Cross points out, accepting this assertion would "invert basic economic principles."  Mem. in Supp. [ECF No. 37] at 48.  I am persuaded that there is a fundamental disconnect between economic theory and GS Labs' § 1 theory and that this disconnect renders GS Labs' § 1 claim implausible.

## XIV

In Count XIV, GS Labs asserts a rule-of-reason violation under § 1 of the Sherman Act.  Am. Countercl. at 168 (Count XIV heading).  Without allegations plausibly showing concerted action, a § 1 claim fails whether based on a *per se* or rule-of-reason analysis.  *See Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992).  Therefore, Count XIV will be dismissed on the same grounds that justified dismissal of Count XIII.

## XV

In Count XV, GS Labs asserts a monopolization claim under § 2 of the Sherman Act.  Am. Countercl. ¶¶ 426–31.  Section 2 makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  To state a monopolization claim under Section 2 of the Sherman Act, a plaintiff must allege facts plausibly showing that the defendant "(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'"  *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th

Cir. 1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); *Moldex Metric, Inc. v. 3M Co.*, No. 14-cv-1821 (JNE/FLN), 2015 WL 520722, at *6 (D. Minn. Feb. 9, 2015).

"A relevant market breaks down into (1) a product market and (2) a geographic market." *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 857 (8th Cir. 2020) (cleaned up). "'The relevant product market includes all reasonably interchangeable products.'" *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (quoting *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998)). "The geographic market is defined by considering the commercial realities faced by consumers." *Double D Spotting Serv.*, 136 F.3d at 560. "It includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" *Id.* (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

GS Labs alleges the relevant product market is the "Commercial Insurance Market for the Purchase of COVID-19 Diagnostic Testing Services." Am. Countercl. ¶ 144. In this market, GS Labs alleges, "the insurer is the buyer and GS Labs is the seller." *Id.* ¶ 157. GS Labs alleges that "Blue Cross and other commercial (private) insurers . . . compete in this market by offering health plan products that reimburse a full suite of medical services, including lab-based COVID-19 diagnostics testing (as required by law), on behalf of their subscribers." *Id.* ¶ 145. GS Labs also alleges that "[p]roducts offered by HMO and other similar managed care insurance providers may be excluded due to their vertical integration, which causes their networks to be unavailable to third party providers and/or their providers

44

to be unavailable to third party insurance carriers." *Id.* ¶ 166.  GS Labs does not allege that it cannot or refuses to accept payment from sources other than private commercial insurers. It alleges, however, that "public insurance programs (such as Medicare, Medicaid, and Tricare) pay for COVID-19 testing at rates that are significantly lower than what commercial insurance plans pay." *Id.* ¶ 140.  GS Labs alleges essentially that it could not operate its "scalable business model" if it were limited to payments from public insurance programs.  *Id.*; *see also id.* ¶¶ 141–42.

This alleged product market is implausible under Eighth Circuit precedent.  In *Little Rock Cardiology Clinic PA v. Baptist Health*, a cardiology clinic ("LRCC") asserted, as relevant here, a § 1 rule-of-reason claim and a § 2 monopolization claim.  591 F.3d 591, 596 (8th Cir. 2009).  LRCC's basic allegation was "that Baptist Health conspired with Blue Cross [& Blue Shield of Arkansas] to restrain trade in, and monopolize the market for, cardiology services for privately insured patients" through a series of arrangements that shut LRCC out from the Blue Cross network.  *Id.* at 594.  LRCC alleged a product market "limited to patients covered by private insurance." *Id.* at 596.  The Eighth Circuit affirmed the district court's Rule 12(b)(6) dismissal of the suit based on its determination that this product market is implausible.  The court explained:

> LRCC proposes a market limited by how consumers pay for cardiology procedures.  This theory lacks support in both logic and law. . . . [T]he general issue when determining the relevant product market concerns the choices available to consumers. *Craftsmen Limousine*, 491 F.3d at 388.  In this case—an exclusive-dealing case involving shut-out cardiologists—the relevant inquiry is whether there are alternative patients available to the cardiologists. *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111,

1119 (10th Cir.2008) ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share."); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R. I.*, 373 F.3d 57, 67 (1st Cir.2004) ("[T]he concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier.*"); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 514 (3d Cir.1998) (stating the "logical assumption that [a pharmacy] considers members of other prescription plans, or uninsured persons, completely interchangeable with [privately insured] members."). Thus, LRCC must look to alternative patients who are able to pay the required fees, not just those who pay using private insurance.

LRCC argues that the product market should be limited to patients using private insurance because private insurance and government insurance—the other primary method of payment—are not reasonably interchangeable. The trouble with this theory is that it analyzes the issue from the wrong side of the transaction. It may be true that, from the patient's perspective, private insurance and Medicare/Medicaid are not reasonably interchangeable. For a variety of reasons, including age and financial considerations, a person with private insurance may not qualify for these government programs. But this lawsuit is not about the options available to patients, it is about the options available to shut-out cardiologists. LRCC's claims boil down to the allegation that, due to Baptist Health's allegedly unlawful actions, LRCC has access to fewer patients. The relevant question, then, is to whom might the cardiologists at LRCC potentially provide medical service? LRCC's complaint provides the answer: LRCC can provide service to "patients . . . from either a government program such as Medicare or Medicaid, *or* from a private insurer." (emphasis added). Patients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable from the cardiologist's perspective—the correct perspective from which to analyze the issue in this case.

*Id.* at 597. Based on this analysis, the court announced a seemingly clear rule: "We conclude that, as a matter of law, in an antitrust claim brought by a seller, a product market

cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller." *Id.* at 598.

Like *Little Rock Cardiology Clinic*, this is an antitrust claim brought by a shut-out seller who alleges that the product market is limited to a single method of payment when there are other methods of payment acceptable to it. GS Labs addresses *Little Rock Cardiology Clinic* in a footnote. Mem. in Opp'n at 54 n.17. There, it says "the inclusion of *all* buyers was deemed necessary [in *Little Rock Cardiology Clinic*] only when there are other methods of payment that are acceptable to the seller." *Id.* (quotation omitted). True, but GS Labs does not allege anywhere in its Amended Counterclaim that other methods of payment are unacceptable to it. It alleges that it could not operate its "scalable business model" if it were limited to payments from public insurance programs. Am. Countercl. ¶ 140; *see also id.* ¶¶ 141–42. But a health care provider saying it could not survive on public-insurance reimbursement alone is not the same thing as saying the provider won't accept public-insurance reimbursement. The bottom line is that GS Labs does not allege it cannot or refuses to accept payment from sources other than private commercial insurers. That seems dispositive under *Little Rock Cardiology Clinic*. GS Labs cites district court cases from outside the Eighth Circuit accepting health-insurance product markets that exclude public programs. Mem. in Opp'n at 53–54. But these cases cannot trump controlling precedent. GS Labs also argues that a Rule 12(b)(6) dismissal based on the implausibility of an alleged product market is disfavored. *Id.* at 53. In the Eighth Circuit case supporting this assertion, *Double D Spotting Serv.*, the panel "note[d] that courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for

discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators."  136 F.3d at 560.  Post-*Twombly*, this expressed hesitancy cannot mean that there is some lesser-than-plausibility standard that applies to allegations of a product market.

GS Labs' geographic-market allegations focus first on where patients go to obtain "lab-based COVID-19 diagnostic testing."  Am. Countercl. ¶ 159.  Patients, alleges GS Labs, "prefer local providers of COVID-19 diagnostic testing services at locations that are convenient to their home or workplace."  *Id.* ¶ 160.  This is "for convenience, to obtain a result faster, to lower the chances that they will expose others (or themselves) to the virus in the course of testing, and to more quickly return home to quarantine or recover from their illness in the event they are symptomatic."  *Id.* ¶ 159.  GS Labs identifies five Minnesota metropolitan areas in which lab-based providers have established operations. *Id.* ¶ 160.  On the commercial insurance side, GS Labs alleges: "Health insurers competing in the Commercial Insurance Market . . . seek to build networks of COVID-19 diagnostic testing providers nationwide, statewide, and in localized geographic markets in populated areas where patients live and work."  *Id.* ¶ 162.  GS Labs alleges that "[t]he geographic market for the Commercial Insurance Market, therefore, is based on the geographic footprint of employers, individually insured people, and other subscribers of commercial insurance products."  *Id.*  In sum, GS Labs alleges: "The relevant geographic markets are: Minnesota; certain counties, cities, or other localities within Minnesota; and/or a territory broader than Minnesota but within the United States."  *Id.* ¶ 158.

These allegations do not plausibly identify a geographic market. If the relevant product market is the "Commercial Insurance Market for the Purchase of COVID-19 Diagnostic Testing Services[,]" *id.* ¶ 144, then the geographic market should be defined by allegations showing where Blue Cross purchases COVID-19 diagnostic testing services. That is where Blue Cross "draws a sufficiently large percentage of its business" in the relevant sense. *Little Rock Cardiology Clinic*, 591 F.3d at 598. The Amended Counterclaim doesn't allege the geographic market this way. It relies instead on allegations showing why patients who obtain COVID-19 testing stay close to home or work (or where they are at the moment they decide to get tested) and where Blue Cross sells insurance, including the allegation that it sells insurance in similarly local markets. At the hearing on this motion, GS Labs argued that this approach nonetheless works because Blue Cross's market power comes from its subscriber base. Tr. [ECF No. 56] at 67. It seems conceivable that the geographic area in which Blue Cross purchases COVID-19 diagnostic testing services may overlap with the territory in which it issues or administers health insurance plans. But that possibility—or even likelihood—doesn't address the absence of allegations plausibly showing a geographic market in which Blue Cross purchases a sufficiently large percentage of its COVID-19 diagnostic testing services.[8]

---

[8] Though not decided here, it is worth expressing doubt regarding whether GS Labs has plausibly alleged anticompetitive conduct. "'Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition.'" *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) (quoting *Morgan v. Ponder*, 892 F.2d 1355, 1358 (8th Cir.1989)). "'When a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a [Sherman Act] violation.'" *Id.* at 549–50 (quoting *Midwest Radio Co., Inc. v. Forum Pub. Co.,* 942 F.2d 1294, 1297–98 (8th Cir.1991)).

XVI

GS Labs asserts a § 2 Sherman Act attempted monopolization claim in Count XVI. The parties do not separately address this claim. Regardless, it seems settled that the failure to allege a plausible product or geographic market dooms this claim. *Par v. Wolfe Clinic, P.C.*, No. 4:21-cv-00290-RGE-SBJ, 2022 WL 2187858, at *8 (S.D. Iowa May 10, 2022); *Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*, No. 18-cv-1044 (MJD/TNL), 2019 WL 5149866, at *8 (D. Minn. Aug. 8, 2019), *report and recommendation adopted*, 2019 WL 4463442 (D. Minn. Sept. 18, 2019). This conclusion makes sense. GS Labs neither alleges nor argues that it can show that Blue Cross has a "dangerous probability of success" in its alleged monopolization efforts without referencing Blue Cross's share of a plausible "relevant market." *See HDC Medical*, 474 F.3d at 549–50 (quoting *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 806–07 (8th Cir. 1987) and *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1181 (8th Cir. 1982)).

---

"[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). GS Labs' theory is essentially that Blue Cross made statements to its members that steered them away from GS Labs because, as GS Labs seems to acknowledge, its services were more expensive. *See* Mem. in Opp'n at 61–62. GS Labs identifies no other affected provider. Under these circumstances, it is difficult to understand why Blue Cross's conduct was anticompetitive or how it caused antitrust injury.

XVII and XVIII

In these Counts, GS Labs alleges antitrust claims under Minnesota law that are parallel to its federal claims.  Minn. Stat. §§ 325D.51–.53.  The parties agree that these claims stand or fall with the federal claims, and there is no reason here to second-guess that judgment.  *See Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) (quoting *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007)).  These claims will therefore be dismissed for the same reasons as the federal claims will be dismissed.

XIX

GS Labs asserts a claim for tortious interference with contract in Count XIX.  Am. Countercl. at 174.  To state a claim for tortious interference with contract under Minnesota law, GS Labs must allege facts plausibly showing: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."  *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (citation omitted).  Showing the absence of justification in turn requires showing an improper means, which "are those that are *independently wrongful* such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or common law."  *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1137 (D. Minn. 2016) (quoting *Harman v. Heartland Food Co.*, 614 N.W.2d 236, 241 (Minn. Ct. App. 2000)) (emphasis added).

GS Labs' tortious-interference allegations attempt to track these elements: (1) GS Labs alleges it has contracts with BCBS affiliates (other than Blue Cross in Minnesota)

"regarding the rates of reimbursement for COVID-19 diagnostic testing provided to those BCBS affiliates' members."  Am. Countercl. ¶ 458.  (2) It alleges that Blue Cross knows of these contracts "by virtue of its participation in the BlueCard program."  *Id.* ¶ 459.  (3) GS Labs alleges that Blue Cross's failure to comply with its obligations under the BlueCard-program contract or contracts (as described above in connection with GS Labs' intended-beneficiary theory) "caused a breach of the reimbursement provisions" in GS Labs' contracts with other BCBS affiliates.  *Id.* ¶ 460; *see also id.* ¶ 463.  (4) GS Labs alleges that "Blue Cross had and has no lawful basis or justification to not reimburse GS Labs at the rates agreed to by certain BCBS affiliates."  *Id.* ¶ 462.  (5) And GS Labs alleges it sustained damages resulting from Blue Cross's alleged tortious interference.  *Id.* ¶ 465.

This claim is implausible.  GS Labs does not allege facts showing that Blue Cross acted without justification.  As noted, interference is without justification if it is accomplished through improper means, and improper means are those that are independently wrongful. *Inline Packaging*, 164 F. Supp. 3d at 1137.  GS Labs alleges no independently wrongful conduct, like threats, violence, or defamation.  It alleges only that Blue Cross breached a contract with other BCBS affiliates and that this breach of contract resulted in other contractual breaches affecting GS Labs.  A contractual breach is not tortious—that is, it is not independently wrongful.  To put it another way, I understand Minnesota law to say that a mere contract breach cannot put the "tort" in a tortious interference claim.  There is another problem.  GS Labs' allegations regarding breach of its contracts with the BCBS affiliates are quite general.  GS Labs does not allege facts plausibly identifying either which BCBS-affiliate contracts were breached or how.

XX

In Count XX, GS Labs asserts a breach-of-contract claim on the theory that it is an intended third-party beneficiary of contracts between Blue Cross and "BCBS affiliates" in other states.  Am. Countercl. ¶ 467.  GS Labs alleges "on information and belief" that these contracts "require Blue Cross to forward all claims from a provider related to services provided to a member of a BCBS affiliate's plan, to that plan."  *Id.* ¶¶ 266, 468.  In other words, GS Labs alleges that if it (or any other provider) submits a claim to Blue Cross in Minnesota for a patient who is in fact covered under a plan insured or administered by a BCBS affiliate in another state, then Blue Cross is contractually required to transmit the claim to that affiliate for a benefits determination by that affiliate.  *See id.* ¶ 180.  GS Labs alleges that Blue Cross assented to these arrangements "through its participation in the BlueCard program."  *Id.* ¶ 266; *see also id.* ¶¶ 176–78 (alleging that the BlueCard program is a claims routing system that "obligates each BCBS affiliate to treat other affiliates' members at the reimbursement level that they have negotiated with providers" and that "'links participating health care providers and independent Blue Cross plans through a single electronic network'").  GS Labs alleges that, if Blue Cross had complied with its obligations under these contracts, it would have been paid "millions" more by the affiliates than Blue Cross has paid (or not paid).  *Id.* ¶ 473.  Central to its claim to be a third-party beneficiary of these contracts, Blue Cross alleges: "On information and belief, the BlueCard program contract(s) between Blue Cross and other BCBS affiliates clearly manifest an intent to benefit providers like GS Labs by establishing a means for these

providers to obtain reimbursement and the benefits of its contracts with an out-of-state

BCBS plan." *Id.* ¶ 468.

"Generally, a stranger to a contract does not have rights under the contract, but an

exception exists if a third party is an intended beneficiary of the contract." *Hickman v.*

*Safeco Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005). To determine whether a third

party is an intended beneficiary of a contract, Minnesota follows the Restatement (Second)

of Contracts § 302. *Cretex Cos., Inc. v. Constr. Leaders, Inc.*, 342 N.W.2d 135, 139 (Minn.

1984). The Restatement provides:

> (1) Unless otherwise agreed between promisor and promisee,
> a beneficiary of a promise is an intended beneficiary if
> recognition of a right to performance in the beneficiary is
> appropriate to effectuate the intention of the parties and either
>
> > (a) the performance of the promise will satisfy an
> > obligation of the promisee to pay money to the
> > beneficiary; or
> >
> > (b) the circumstances indicate that the promisee intends
> > to give the beneficiary the benefit of the promised
> > performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an
> intended beneficiary.

Restatement (Second) of Contracts § 302; *see also Caldas v. Affordable Granite & Stone,*

*Inc.*, 820 N.W.2d 826, 832–33 (Minn. 2012). "In determining the parties' intent, we look

to the language of the contract." *Caldas*, 820 N.W.2d at 833. This contract examination

seems essential applying the intent-to-benefit rule of § 302(1)(b), and courts applying the

test engage in a close review of the relevant contract. *See, e.g., id.* at 833–35; *Kruger v.*

*Lely N. Am., Inc.*, 518 F. Supp. 3d 1281, 1289 (D. Minn. 2021). "In most cases, 'when

there is no reference to the third party in the contract, there is no intent to benefit the third party.'" *Dayton Dev. Co. v. Gilman Fin. Servs., Inc.*, 419 F.3d 852, 856 (8th Cir. 2005) (quoting *614 Co. v. Minneapolis Cmty. Dev. Agency*, 547 N.W.2d 400, 410 (Minn. Ct. App. 1996)).

GS Labs alleges that Blue Cross's contracts with other BCBS affiliates indicate an intent to benefit GS Labs (and presumably every other provider), but this allegation is implausible.[9]  GS Labs' description of these contracts omits mention of any particular contract term or terms indicating an intent to benefit providers.  GS Labs does not allege that it or providers generally are referenced in the contracts (or any of them).  It is true that GS Labs alleges that these contracts "clearly manifest an intent to benefit providers[,]" Am. Countercl. ¶ 468, but this allegation is not sufficient.  It pleads a legal conclusion because the allegation merely repeats Minnesota's intent-to-benefit rule.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  It is made "[o]n information and belief" because GS Labs does not have the contracts.  Am. Countercl. ¶ 468.  In other words, it is not possible to examine the contracts to determine whether any or all of them express an intent to benefit providers.  (GS Labs faults Blue Cross for declining to file the contracts, but GS Labs identifies no authority that might have required Blue Cross to do that.)  Regardless, this claim's supporting allegations show at most that

---

[9]      GS Labs does not attempt to meet the duty-owed test in § 302(1)(a).  Its allegation that Blue Cross's transmission of the claim to the appropriate BCBS affiliate results only in a "benefits determination[]" and not necessarily payment, Am. Countercl. ¶ 180, would undermine that contention.

providers might benefit incidentally from the presence of these contracts in the same way providers might benefit from any contract facilitating the efficient adjudication of a benefits claim. That is not enough to plausibly allege a breach-of-contract claim via an intended-beneficiary theory under Minnesota law.

## XXI

In Count XXI, GS Labs alleges facts supporting a claim for punitive damages under Minnesota law. Am. Countercl. at 176. Whether this Count should be dismissed depends on the resolution of two issues. The first concerns the procedural propriety of the claim. Minnesota law, specifically Minn. Stat. § 549.191, prohibits plaintiffs from seeking punitive damages in an initial complaint. Blue Cross argues that GS Labs' punitive damages claim should be dismissed under the Minnesota statute. Though older cases in this District applied the statute in diversity cases, the recent intra-District trend has been not to apply the statute in favor of Rules 8 and 15 of the Federal Rules of Civil Procedure. *See Am. Achievement Corp. v. Jostens, Inc.*, --- F. Supp. 3d ---, No. 21-cv-2613 (NEB/BRT), 2022 WL 3566862, at *9–10 (D. Minn. Aug. 18, 2022) (reviewing issue and citing cases); *cf. Shank v. Carleton Coll.*, 329 F.R.D. 610, 615 (D. Minn. 2019) (recognizing that the state of the law on this question has been "in flux"). The case on which Blue Cross relies, *Bergman v. Johnson & Johnson*, No. 20-cv-2693 (JRT/HB), 2021 WL 3604305 (D. Minn. Aug. 13, 2021), doesn't support Blue Cross's position. There, the court declined to resolve the question because it was "irrelevant." *Id.* at *6 ("As there is no motion to amend or proposed amended complaint at issue in the present matter, the issue

of which standard the Court would apply to determine whether a plaintiff may seek punitive damages is irrelevant.").

Assuming GS Labs' claim is procedurally proper under the more recent intra-District trend, there is another problem. GS Labs' remaining claims are for benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), and for promissory estoppel under Minnesota law. Punitive damages are not recoverable in an ERISA benefits claim under § 1132(a)(1)(B). *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985) (determining that ERISA does not provide a cause of action for extracontractual compensatory or punitive damages in the context of a benefits claim). And though I've found no case answering the question under Minnesota law, other jurisdictions hold that punitive damages are not recoverable under a promissory estoppel claim. *See, e.g.*, *Beluca Ventures LLC v. Einride Aktiebolag*, No. 21-cv-06992-WHO, 2022 WL 17252589, at *5 (N.D. Cal. Nov. 28, 2022) (holding that punitive damages are not recoverable for promissory estoppel or other quasi-contract claims under California law); *LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at *18 n.11 (E.D.N.Y. Sept. 24, 2022) ("Punitive damages are not available under New York law for Plaintiff's promissory estoppel or quasi-contract claims."); *Dugdale, Inc. v. Alcatel-Lucent USA, Inc.*, No. 1:09-cv-0960-JMS-TAB, 2011 WL 2261318, at *4 (S.D. Ind. June 7, 2011) (applying Indiana law). In view of these authorities, I think the wiser course is to dismiss GS Labs' punitive damages claim. Of course, if GS Labs is able to cite Minnesota authority permitting a recovery of punitive damages for promissory estoppel, it may re-assert the claim.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.      Blue Cross's motion to dismiss [ECF No. 35] is **GRANTED IN PART** and

**DENIED IN PART**.

2.      Counts I, II, VI, and IX insofar as it asserts a claim under 29 U.S.C. §

1132(a)(3) are **DISMISSED WITH PREJUDICE**.

3.      Counts III, V, VII, VIII, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX,

XX, and XXI are **DISMISSED WITHOUT PREJUDICE**.

4.      The motion is **DENIED** with respect to Counts IV and IX insofar as it asserts

a claim under 29 U.S.C. § 1132(a)(1).


Date:  January 30, 2022                          s/ Eric C. Tostrud
                                                 Eric C. Tostrud
                                                 United States District Court

58